The DARTMOUTH REVIEW, on behalf of its Officers, Staff, and Subscribers; Christopher Baldwin; John Sutter; John Quilhot; The Hanover Review, Inc.

v.

DARTMOUTH COLLEGE; Dartmouth College Committee on Standards; James O. Freedman, in his capacities as President and a Trustee of Dartmouth College; Edward J. Shanahan, in his capacities as the Chairman of the Dartmouth College Committee on Standards; Board of Trustees of Dartmouth College and each of the following in their capacity as a Trustee of Dartmouth College; Richard M. Bressler, Lisle C. Carter, Jr., Robert A. Danziger, Robert R. Douglass, Ann Fritz–Hackett, Robert P. Henderson, Hon. Ira Michael Heyman, Joseph D. Mathewson, Priscilla Frechette–Maynard, Norman E. McCulloch, Jr., George B. Munroe, Robert Reich, E. John Rosenwald, Jr., Ronald B. Schram, Dr. John F. Steel.

Civ. No. 88–320–D.

United States District Court,
D. New Hampshire.

March 20, 1989.

Cary P. Clark, Hanover, N.H., and Jack B. Middleton, Manchester, N.H., for defendants.

## OPINION

DEVINE, Chief Judge.

In this civil rights action, the individual plaintiffs are three white students who were suspended from Dartmouth College subsequent to their confrontation with a black professor. Plaintiffs allege that the College and the other named defendants discriminated against them in the disciplinary proceedings, depriving them of contractual rights on the basis of race, in violation of 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. The matter is currently before the Court on defendants' motion to dismiss for failure to state a claim upon which relief may be granted. *See* Rule 12(b)(6), Fed.R.Civ.P. Plaintiffs object to the motion.[1]

A motion to dismiss is one of limited inquiry. The standard for granting the motion is not the likelihood of success on the merits, but is whether plaintiffs are entitled to offer evidence to support their claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court's consideration is limited to the allegations of the complaint, *Litton Indus. v. Colon*, 587 F.2d 70, 74 (1st Cir. 1978), and those allegations are to be construed in the light most favorable to plaintiffs and taken as admitted, with dismissal to be ordered only if plaintiffs are not entitled to relief under any set of facts they could prove. *Chasan v. Village Dist. of Eastman*, 572 F.Supp. 578, 579 (D.N.H. 1983), *aff'd without opinion*, 745 F.2d 43 (1st Cir.1984). This is not to say that plaintiffs have unfettered discretion; the Court is not required to give weight to "bald assertions, unsupportable conclusions, or opprobrious epithets." *Royal v. Leading Edge Prod.*, 833 F.2d 1 (1987) (quoting *Chongris v. Board of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir.1987)).

Harvey D. Myerson, New York City, and Francis G. Murphy, Jr., Manchester, N.H., for plaintiffs.

1. Because the matter may be resolved on the documents as filed, defendants' request for oral argument is herewith denied. *See* Local Rule 11(g).

## Factual Background

The Dartmouth Review is an independent college newspaper published by plaintiff Hanover Review, Inc., a nonprofit corporation. At all times relevant to this action, plaintiffs John Sutter, Christopher Baldwin, and John Quilhot were enrolled as students at Dartmouth College and were members of the Review staff.

On February 24, 1988, the Review published an article entitled "Dartmouth's Dynamic Duo of Mediocrity", criticizing courses taught by two Dartmouth professors. One of those criticized was William Cole, a black professor in the music department. Apparently there is a history of ill will between Cole and the Review.[2] Prior to publication of the February 24 article, Review members made two attempts to contact Cole by telephone to give him an opportunity to reply to the article. Cole hung up on the students the first time and allegedly became "abusive and insulting" during the second call.

Members of the Review subsequently contacted legal counsel for advice. Counsel advised the students to inform Professor Cole in writing of the editorial policy of the Review, affording him the right to a published, unedited response. He also told them they could ask Cole for an apology for the remarks he had made on the telephone.

On February 25, 1988, the following events took place which gave rise to the disciplinary action against the individual plaintiffs. Plaintiffs Sutter, Baldwin, and Quilhot, and one other member of the Review staff approached Professor Cole after he had finished teaching a class to give him a copy of the editorial policy and to demand the apology in person. Plaintiff Quilhot held a camera, and plaintiff Sutter brought a tape recorder. There ensued an approximately five-minute altercation between the plaintiffs and Cole, during which Cole became extremely agitated. Plaintiff Baldwin unsuccessfully attempted to give Cole the editorial policy statement. Quilhot began taking pictures of Professor Cole, at which point Cole allegedly grabbed his arm and broke the camera flash. Plaintiff Sutter then demanded the apology from Cole on behalf of the Review. Cole refused. Cole then noticed the tape recorder, and Sutter acknowledged he was taping the incident. Sutter complied with Cole's request that he stop taping. Plaintiffs then left the room.

The next day, on the complaint of Professor Cole, the Dartmouth Committee on Standards ("COS") charged the student plaintiffs with "harassment, violation of the right to privacy and disorderly conduct." Plaintiffs allege that as the incident with Professor Cole became generally known on campus, "anti-Review forces" began to characterize the Review's motives in confronting Professor Cole as racial.[3]

In response to the furor on campus, President Freedman addressed a rally organized in support of Professor Cole by the Afro–American Society. President Freedman stated that racism, sexism, and other forms of ignorance and disrespect have no place on the Dartmouth campus. In a March 2, 1988, Boston Globe article, President Freedman was quoted as saying,

> I feel dreadful about the attack on Professor Cole.... I do not want one minority or woman student to decline to come to Dartmouth because of the perception that this incident is representative of the true Dartmouth. It is not. The timing of this is dreadfully suspicious, coming five weeks before acceptance [of new students] go out.

Complaint ¶ 46.

Hearings regarding the charges against the students took place on March 5 and 6. Plaintiffs allege numerous procedural irregularities and bias on the part of the

---

**2.** The Review has published prior negative articles about Professor Cole, and in 1983 Cole sued the Review for libel. The suit was eventually dropped.

**3.** Plaintiffs assert that anti-Review posters appeared on campus that contained a racial slur falsely attributed to plaintiff Sutter. Review members were allegedly threatened by other students. Plaintiffs do not allege that any of the named defendants were involved in these incidents.

COS. The COS found plaintiffs guilty of the charges against them, and the following penalties were imposed: plaintiffs Sutter and Baldwin were suspended from classes until the fall of 1989, and plaintiff Quilhot was suspended from classes until the fall of 1988. The students appealed the COS decision to Dean Shanahan, who upheld the decision.[4]

Following the disciplinary action, President Freedman stated in a speech to the faculty,

Dartmouth College ... must not stand by silently when a newspaper recklessly sets out to create a climate of intolerance and intimidation that destroys our mutual sense of community. What the *Review* has done on this campus has not been decent. What it has done has been irresponsible, mean-spirited, cruel and ugly. I now see that *The Review* is dangerously affecting—in fact, poisoning—the intellectual environment of our campus.

*Id.* ¶ 58. He stated that the *Review* used "bullying tactics ... designed to have the effect of discouraging women and members of minority groups from joining our faculty or enrolling as students...."

### Discussion

#### Count I

■ Count I of the complaint alleges that defendants discriminated against plaintiffs on the basis of race in violation of 42 U.S.C. § 1981. Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property

as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981 derives from the Civil Rights Act of 1866, which was enacted to implement the Thirteenth Amendment to the United States Constitution and "to abolish all the remaining badges and vestiges of the slavery system." *Springer v. Seaman,* 821 F.2d 871, 881 (1st Cir.1987) (quoting *Haugabrook v. City of Chicago,* 545 F.Supp. 276, 280 (N.D.Ill.1982)). Section 1981 was intended to prohibit all racially motivated deprivations of the rights enumerated therein. *General Bldg. Contractors Ass'n v. Pa.,* 458 U.S. 375, 388, 102 S.Ct. 3141, 3148, 73 L.Ed.2d 835 (1981); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 426, 88 S.Ct. 2186, 2195, 20 L.Ed.2d 1189 (1968). Thus, the United States Supreme Court has interpreted section 1981 to apply not only to governmental actions, but also to private acts of discrimination. *See Runyon v. McCrary,* 427 U.S. 160, 175, 96 S.Ct. 2586, 2596, 49 L.Ed.2d 415 (1976).[5] The Supreme Court has also stated that section 1981 prohibits racial discrimination against white persons. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 287, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976).

■ A plaintiff bringing a section 1981 action must plead and prove that the defendant's actions were "intentionally discriminatory and racially motivated." *Albert v. Carovano,* 851 F.2d 561 (2d Cir.1988); *see also General Bldg., supra,* 458 U.S. at 391, 102 S.Ct. at 3150. It is not necessary that racial discrimination be the only reason for the harm; however, it must be the "determining factor". *Rowlett v. Anheuser–Busch,* 832 F.2d 194, 201 (1st Cir.1987)

---

**4.** Sutter's and Baldwin's suspensions have been revoked pursuant to a January 3, 1989, order of the Grafton County Superior Court, in parallel state court litigation. *The Dartmouth Review, et al. v. Dartmouth College, et al.,* No. 88–E–111, slip op. (Jan. 3, 1989). Judge Mohl granted plaintiffs' request for temporary injunctive relief on the limited ground that one member of the COS panel was biased against the *Review.* *Id.* at 22.

**5.** Currently pending before the United States Supreme Court is the case of *Patterson v. McLean Credit Union,* No. 87–107, in which the Court is reconsidering the issue of section 1981's applicability to private actors. *See Patterson v. McLean,* 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed. 2d 879 (1988). As of the date of this Order, the Supreme Court has not rendered a decision in *Patterson,* and this Court accordingly considers *Runyon* to be binding precedent.

(citing *Loeb v. Textron,* 600 F.2d 1003, 1019 (1st Cir.1979)). Discriminatory intent may be proved by direct evidence or may be inferred from circumstantial evidence, such as a pattern of conduct inexplicable on grounds other than race. *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1438 (9th Cir.1984) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)).

It is well settled in this Circuit that a civil rights action must be specifically pleaded to withstand a motion to dismiss. *Johnson v. General Elec. Co.,* 840 F.2d 132, 138 (1st Cir.1988); *Dewey v. New Hampshire,* 694 F.2d 1, 3 (1st Cir.1982), *cert. denied,* 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). "Plaintiffs cannot be merely conclusory regarding the characterization of the defendant['s] motives; a subjective characterization of those motives will not suffice." *Johnson, supra,* 840 F.2d at 138 (citing *Fisher v. Flynn,* 598 F.2d 663, 665 (1st Cir.1979)). Instead, plaintiffs must outline the specific facts which give rise to an inference of discriminatory animus. *Id.* "It is not enough to allege a general scenario which could be dominated by unpleaded facts." *Id.* (quoting *Dewey, supra,* 694 F.2d at 3).

Thus, to sufficiently state a claim under § 1981, plaintiffs "must allege some facts that demonstrate that [their] race was the *reason* for defendants' [ ]actions." *Jafree v. Barber,* 689 F.2d 640, 643 (7th Cir.1982) (emphasis in original). In the absence of a showing of facial animus, either explicitly or reasonably inferable from the pleadings, plaintiffs cannot maintain this section 1981 action. *Anooya v. Hilton Hotels Corp.,* 733 F.2d 48, 50 (7th Cir.1984).

The Court first considers whether plaintiffs have pleaded sufficient facts to support their claim that defendants' actions were racially motivated. Plaintiffs assert that President Freedman's comments to students, faculty, and the press constitute direct evidence of his discriminatory intent. Plaintiffs argue that Freedman's comments about the incident were motivated by his desire to prevent the alienation of minority students and faculty and that his "racially motivated" actions pressured the COS to unfairly charge and punish plaintiffs.

The Court finds that President Freedman's statements do not constitute evidence that he was motivated by racial animus. Although it may be inferred that President Freedman believed plaintiffs' motives were racial and that he feared their actions would discourage minority students from applying to Dartmouth, it is not reasonable to infer that President Freedman's motives in making his comments were racial; i.e., that the plaintiffs' race was the reason for his actions.[6] *See Jafree, supra,* 689 F.2d at 643; *cf. Lincoln v. Board of Regents,* 697 F.2d 928, 942 n. 19 (11th Cir.1983) (petition calling teacher a "racist" does not, standing alone, constitute evidence that action was taken against her because of her race).

The hollow nature of plaintiffs' allegations becomes apparent when compared with cases in which courts have found evidence of racially discriminatory intent. *See, e.g., Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1420 (7th Cir.1986) (foreman called black worker a "nigger" to his face, often referred to blacks in that manner, and acknowledged other workers were racists); *Domingo, supra,* 727 F.2d at 1433 (company records labeled work crews and job descriptions by race); *Lincoln, supra,* 697 F.2d at 943 (plaintiff referred to as "this white lady", co-worker stated he "hated white people"). Plaintiffs have not alleged comparable facts which would create an inference that President Freedman was racially biased.

---

**6.** Although plaintiffs correctly note that under certain circumstances a plaintiff may state a cognizable section 1981 claim without a showing that his race was the reason for the discrimination, this is not one of those cases. The authority upon which plaintiffs rely stands for the proposition that whites may bring section 1981 claims if they are injured in an attempt to vindicate the rights of non-whites or because of their association with non-whites. *See, e.g., Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969); *Fiedler v. Marumsco Christian School,* 631 F.2d 1144, 1150 (4th Cir.1980) (and citations therein). Plaintiffs here do not allege that their injuries resulted from such activities.

Moreover, plaintiffs do not specifically allege that any racial bias influenced the decision of the COS panel. Instead, plaintiffs only make the conclusory statement that "President Freedman's actions put pressure on the COS and its Chairman, Dean Shanahan, who is President Freedman's subordinate, to ensure that plaintiffs would be severely disciplined." Complaint ¶ 50. Although plaintiffs set forth various statements by members of the COS panel which purportedly evidence President Freedman's influence, *see id.* ¶ 53, none of the comments cited reflect any *racial* animus. At most, they are allegations of anti-*Review* bias. Plaintiffs assert that members of the panel "expressed extreme anti-*Review* sentiments," "made prejudicial remarks about the *Review*," and "conducted the proceedings in a prejudicial and hostile manner." *Id.* In fact, plaintiffs themselves summarize the allegations as "manifest anti-*Review* bias in the COS." *Id.* ¶ 54. These allegations of anti-*Review* bias do not support a section 1981 claim of racial discrimination. *See Albert v. Carovano, supra,* 851 F.2d 561.

In *Albert,* plaintiffs, students at a private college, were suspended after they refused to end a three-day occupation of an administration building. Plaintiffs brought a 1981 action, alleging that the college selectively enforced college rules against them because, among other things, they "support[ed] the rights of blacks or Latins." *Id.* at 572.

In dismissing the action for failure to state a claim, the court stated that "[t]here is no authority ... to support the proposition that a non-minority plaintiff may bring a Section 1981 action for retaliation by another as a consequence of the plaintiff's support of political or other causes favored by minorities.... Protection of such activity must be found in the first amendment and pursued in a Section 1983 action after a showing of state action. *Cf. Keating v. Carey,* 706 F.2d 377, 384 (2d Cir.1983)

('§ 1981, however generously construed, does not prohibit discrimination on the basis of political affiliation')." *Id.* at 573.

Similarly, if action was taken against plaintiffs because they were members of the *Review,*[7] section 1981 rights are not implicated. Even if the *Review*'s actions were perceived by certain members of the Dartmouth community to be racially motivated, this creates an inference of bias based on plaintiffs' political convictions, not an inference of racial animus. As *Albert* makes clear, such an inference does not support a claim for relief under section 1981.

Plaintiffs also attempt to create an inference of discriminatory intent by referring to prior cases of student discipline at Dartmouth College. Plaintiffs assert that the following allegations constitute comparable circumstances of disparate treatment from which racial discrimination can be inferred:

1. Dartmouth did not discipline a group of students who erected shanties on campus to protest the College's investment in companies doing business in South Africa. "Many of these students were minorities." Complaint ¶ 27.

2. Dartmouth suspended 10 of 12 students who attempted to dismantle the shanties. This group was "largely comprised of non-minorities." *Id.* ¶ 28.

3. Dartmouth reprimanded but did not suspend 29 students who took over the College Administration Building in protest of the attempted destruction of the shanties. The students were found to have "deliberately obstruct[ed] the orderly processes of the College." *Id.* ¶ 30.

To state a claim of selective enforcement, plaintiffs must allege that they were treated more harshly than similarly situated persons of another race. *See Martin v. Citibank, N.A.,* 762 F.2d 212, 217 (2d Cir. 1985); *see also Albert, supra,* 851 F.2d at 573. The others must be similarly situated "in all relevant respects," *Smith v. Mon-*

---

**7.** And even this allegation is called into doubt by Judge Mohl's opinion in the state court proceedings, in which he stated: "The Court finds no persuasive evidence that Dartmouth College has retaliated against or otherwise pursued disciplinary action against the plaintiffs on account of their association with the *Dartmouth Review.*" *Dartmouth Review v. Dartmouth College, supra,* slip op. at 23.

*santo Chemical Co.,* 770 F.2d 719, 723 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986).

The Court finds that inferences of racial discrimination cannot be drawn from the prior incidents of student discipline to which plaintiffs refer. Although the prior incidents involved race-related concerns, plaintiffs have not alleged that the students responsible for those incidents received different discipline because of their race. Plaintiffs make no allegations regarding the race of the students who were suspended for the takeover of the administration building. Further, plaintiffs' allegations regarding the other incidents demonstrate that these groups were racially mixed. Thus, the allegations actually suggest that students were disciplined or not disciplined based on factors other than race. *Cf. Albert, supra,* 851 F.2d at 572 (the "allegations tend to contradict the race or ethnicity claim because they suggest that the sanction of suspension was imposed ... without regard to their race or ethnicity").

Moreover, none of those prior incidents involve students who were similarly situated; i.e., who were in "reasonably comparable circumstances." *See id.* at 573. Plaintiffs assert that all of the events involved "conduct disruptive of the orderly functioning of the College." This purported similarity is simply too broad to state a claim. "[T]he nature of the infraction and knowledge of the evidence by college officials must be sufficiently similar to support a finding of facial inconsistency." *Id.* at 574. The reason for this stringent standard is clear in the school disciplinary context. "Otherwise, every conclusory selective-enforcement claim would lead to discovery concerning the entire disciplinary history of a college and then to a confusing, unmanageable, and ultimately incoher-

ent retrial of every disciplinary decision, including decisions not to investigate." *Id.*

The instant case involves discipline of students who confronted a professor and were charged with invasion of privacy, harassment, and disorderly conduct. None of the prior incidents of student discipline involved confrontations between faculty and students. Thus, the Court finds they are not reasonably comparable situations which would provide a basis for plaintiffs' claim of disparate treatment.

Plaintiffs also try to substantiate their disparate treatment claim by asserting that they were treated differently from Professor Cole regarding this incident.[8] Clearly, a tenured faculty member and a student are not similarly situated simply because they were both involved in the same incident. There is no allegation that the same standards of conduct apply to students and faculty, nor that they are subject to the same sort of disciplinary proceedings. Accordingly, this allegation does not support the claim of disparate treatment.[9]

Plaintiffs have also failed in their attempt to state a claim that the defendant Trustees' actions were racially motivated. The sole allegation of trustee involvement is contained in paragraph 49, which states:

> [T]he College's Board of Trustees has supported the anti-*Review* actions and sanctioned President Freedman's attack. They have gone so far as to endorse officially President Freedman's remarks in opposition to the *Review* and about the Professor Cole issue.

For the reasons set forth above, this conclusory allegation does not give rise to an inference that the trustees' actions were racially motivated and accordingly cannot serve to support a section 1981 claim against these defendants.

Regarding the final defendant, Dean Shanahan, the complaint makes the same

---

8. Three days after the confrontation with Professor Cole, plaintiffs filed a complaint against him. A subsequent investigation by two college deans determined that the charges were unfounded.

9. Similarly, plaintiffs' allegation that President Freedman refused to meet with plaintiff Sutter,

although he met with a group of black students, Complaint ¶¶ 47, 48, does not give rise to an inference of racial discrimination. There is no allegation that the students were similarly situated; i.e., that the black students were also charged with violating disciplinary rules.

conclusory assertion that President Freedman unduly influenced the Dean's decision to affirm the COS findings. Complaint ¶ 50. Plaintiffs also allege that Dean Shanahan refused to do more than direct plaintiffs to the student handbook when they requested assistance in filing a complaint against Professor Cole. *Id.* ¶ 45. These allegations do not raise an inference of racial animus. Accordingly, because plaintiffs have failed to allege the necessary facts which could give rise to an inference that defendants intentionally discriminated on the basis of race, they have not stated a claim under 42 U.S.C. § 1981, and Count I must be and herewith is dismissed.

*Count II*

■ Count II alleges violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. That statute provides in pertinent part:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program oor activity receiving Federal financial assistance.

To make out a direct claim under Title VI, plaintiffs must allege and prove that the discriminatory act of which they complain was purposeful and intentional.[10] *Alexander v. Choate*, 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985) ("Title VI itself directly reach[es] only instances of intentional discrimination"); *Latinos, supra* note 9, at 783 ("To prevail with a direct claim under [Title VI] plaintiffs must show that defendant acted with discriminatory intent.").

For reasons set forth above, the Court finds that plaintiffs have failed to plead facts demonstrating intentional racial animus. Accordingly, plaintiffs have failed to meet the minimum pleading requirements of a Title VI case, and Count II must be and herewith is dismissed.

In sum, for reasons set forth above, the Court herewith grants defendants' motion to dismiss (document no. 11).

SO ORDERED.

---

**10.** A cause of action under Title VI may also be proven by showing disparate impact if the basis of the claim is a breach of the regulations promulgated thereunder. *See Latinos Unidos De Chelsea En Accion v. Secretary of HUD*, 799 F.2d 774, 785 n. 20 (1st Cir.1986). Plaintiffs do not allege a breach of the relevant regulations; accordingly, they must allege intentional discrimination.