**THE DARTMOUTH REVIEW, on Behalf of Its Officers, Staff and Subscribers, et al., Plaintiffs, Appellants,**

v.

**DARTMOUTH COLLEGE, et al., Defendants, Appellees.**

**No. 89–1466.**

United States Court of Appeals, First Circuit.

Heard Sept. 6, 1989.

Decided Nov. 9, 1989.

Francis G. Murphy, Jr., with whom Nixon Hall & Hess Professional Ass'n, Manchester, N.H., Myerson & Kuhn, Harvey D. Myerson, Arthur H. Ruegger, Joseph E. Boury, and Julie A. Day, New York City, were on brief, for plaintiffs, appellants.

Carol Ann Conboy, with whom Jack B. Middleton, Robert A. Wells, Jane E. Cetlin and McLane, Graf, Raulerson & Middleton, Professional Ass'n, Manchester, N.H., were on brief, for defendants, appellees.

Before SELYA, Circuit Judge, ALDRICH and GIBSON *, Senior Circuit Judges.

SELYA, Circuit Judge.

This suit was brought in consequence of a riptide of unpleasantness which flooded the Dartmouth College campus during the second semester of the 1987–88 academic year.[1] The district court ordered dismissal for failure to state a claim. *Dartmouth Review v. Dartmouth College*, 709 F.Supp. 32 (D.N.H.1989). We affirm.

As needs must, we start by summarizing the factbound allegations of plaintiffs' two-count complaint insofar as material to our inquiry. In so doing, we do not purport to divine the truth of a conflicted situation, but describe only what plaintiffs claim the

---

* The Hon. Floyd R. Gibson, of the Eighth Circuit, sitting by designation.

1. Plaintiffs (appellants before us) comprise the Dartmouth Review (Review); its publisher, Hanover Review, Inc.; and three collegians active in the Review's affairs. Defendants (appellees) are the College; its Committee on Standards (a joint administration/faculty/student board responsible for enforcing standards of conduct on campus); and various officials of the College (including its president and trustees).

facts to have been, parroting the complaint's well-pled averments. It is in reliance on these facts—albeit much embroidered in 39 pages laced with rhetoric and invective—that plaintiffs sued in New Hampshire's federal district court charging violations of 42 U.S.C. § 1981 (1982) and 42 U.S.C. § 2000d et seq. (1982) (Title VI). And it is on these facts that the district court determined that no federal-law claim was presented.

## I

Dartmouth is a private college. Christopher Baldwin, John Quilhot, and John Sutter (collectively, the Students), all white men enrolled at Dartmouth, were staff members of the Review, an off-campus, non-profit newspaper. In February 1988, the Review published features strongly critical of two Dartmouth professors. One target was William Cole,[2] a black music professor said to have used improper language and taught "irrelevant" material. The Students hoped Cole would respond in the Review's next issue. Telephone calls having proved unavailing, they approached Cole in his classroom moments after class ended on February 25. The Students (armed with camera and tape recorder) told the professor why they had come, but he screamed profanities at them. Baldwin attempted to hand Cole a letter inviting a response to the article. Cole became violent, breaking the camera's flash attachment and "poking his fingers at Mr. Baldwin's eyes." The Students departed.

These events precipitated what the complaint terms an "anti-Review hysteria." Cole lost little time in contacting the Committee on Standards (COS), which preferred charges of harassment and disorderly conduct against the Students. The Students, in turn, filed charges against Cole (who was found not guilty). Posters appeared alleging, without foundation, that Sutter was guilty of racial slurs. Threats of violence were communicated to Review members. Dartmouth's president, speaking at an anti-Review rally sponsored by the

school's Afro–American Society, declared "that racism, sexism and other forms of ignorance and disrespect have no place at Dartmouth." He told the *Boston Globe:*

> I feel dreadful about the attack on Professor Cole ... I do not want one minority or woman student to decline to come to Dartmouth because of the perception that this incident is representative of the true Dartmouth. It is not. The timing of this is dreadfully suspicious, coming five weeks before acceptances [of new students] go out.

The president refused to grant the Students an audience, but met freely with anti-Review undergraduates (most of whom were black). The College's dean, who chaired the COS, refused to give the Students assistance or guidance, despite explicit provisions in the College's student handbook promising such help. According to the complaint, such actions show that the administration had "publicly prejudge[d]" the February 25 incident and harbored an anti-Review bias, ascribing "a racial and anti-Dartmouth animus" to plaintiffs.

The COS hearing took place in March. The Students allege that the hearing afforded them "no fundamental fairness and sacrificed numerous procedural safeguards;" for example, they were not allowed representation by counsel, effective cross-examination, or an unbiased hearing panel. They were found guilty of all charges. Quilhot was suspended until the fall of 1988; Sutter and Baldwin for a year longer. The suspensions were upheld on appeal to the dean. Betimes, the president continued his verbal assault, accusing the Review of "bullying tactics ... designed to have the effect of discouraging women and members of minority groups from joining our faculty or enrolling as students...."

As previously recounted, the district court ruled that the complaint was insufficient to state an actionable claim. 709 F.Supp. at 36–39. This proceeding ensued.

**2.** There is apparently documented antagonism between Cole and the Review dating back to

1983. The complaint gives plaintiffs' version of that history.

## II

The standard of review is not in doubt. Like the district court, we are governed by the familiar constraints of Fed.R.Civ.P. 12(b)(6). Accordingly, we must accept all well-pled factual averments as true, and draw all reasonable inferences therefrom in appellants' favor. *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 276, 96 S.Ct. 2574, 2576, 49 L.Ed.2d 493 (1976); *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988). In so doing, however, we "eschew any reliance on bald assertions, unsupportable conclusions, and 'opprobrious epithets.'" *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987) (quoting *Snowden v. Hughes*, 321 U.S. 1, 10, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944)). It is only if the complaint, so viewed, presents no set of facts justifying recovery that we may affirm the dismissal. *Conley v. Gibson*, 355 U.S. 41, 45–48, 78 S.Ct. 99, 101–03, 2 L.Ed.2d 80 (1957); *Gooley*, 851 F.2d at 514.

We have repeatedly cautioned that, notice pleading notwithstanding, Rule 12(b)(6) is not entirely a toothless tiger. "[M]inimal requirements are not tantamount to nonexistent requirements. The threshold [for stating a claim] may be low, but it is real...." *Gooley*, 851 F.2d at 514. Thus, plaintiffs are obliged to set forth in their complaint "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory." *Id.* at 515. The need is perhaps greater where allegations of civil rights violations lie at the suit's core:

> Dismissal of a claim requires the most close analysis by an appellate court, balancing the overall liberal thrust of the simplified civil rules on the one hand, against the repeated demands by our and other courts that there be more than conclusory allegations, even in civil rights cases.

*Dewey v. University of New Hampshire*, 694 F.2d 1, 3 (1st Cir.1982) (citation omitted), *cert. denied*, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983). Gauzy generalities, unsupported conclusions, subjective characterizations, and problematic suppositions can sprout as easily as crabgrass in an imaginative litigant's (or lawyer's) word processor. Therefore, to avoid tarring defendants' reputations unfairly and to prevent potential abuses, we have consistently required plaintiffs to outline facts sufficient to convey specific instances of unlawful discrimination. *See, e.g., id.; Fisher v. Flynn*, 598 F.2d 663, 665 (1st Cir.1979) (Title VII; § 1983); *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977) (§ 1983), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978); *see also Johnson v. General Elec.*, 840 F.2d 132, 138 (1st Cir.1988) (Title VII). As we have said in the summary judgment context, plaintiffs must point, if not to fire, at least to some still-warm embers; "smoke alone is not enough to force the defendants to a trial to prove that their actions were not [racially] discriminatory." *Manego v. Cape Cod Five Cents Savings Bank*, 692 F.2d 174, 177 (1st Cir.1982).

We are cognizant that the line between "facts" and "conclusions" is often blurred. But, there are some general parameters. Most often, facts are susceptible to objective verification. Conclusions, on the other hand, are empirically unverifiable in the usual case. They represent the pleader's reactions to, sometimes called "inferences from," the underlying facts. It is only when such conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that "conclusions" become "facts" for pleading purposes.

With these precepts in mind, we turn to the business at hand.

## III

■ Appellants contend that the facts alleged in count I make out a cognizable claim under a statute which provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. The statute extends to private conduct as well as state action. *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989); *Runyon v. McCrary,* 427 U.S. 160, 168 & n. 8, 96 S.Ct. 2586, 2593 & n. 8, 49 L.Ed.2d 415 (1976). Independent academic institutions are within the law's prohibitory reach. *See St. Francis College v. Al–Khazraji,* 481 U.S. 604, 609, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987); *Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988) (en banc). Nevertheless, section 1981 does not forbid all discrimination in contractual matters, but only certain contract-related acts, *Patterson,* 109 S.Ct. at 2372; and then, only if the discrimination in question is both purposeful and based on race. *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1026 (1st Cir.1988); *Springer v. Seaman,* 821 F.2d 871, 880 (1st Cir.1987). If any of these elements is missing, a section 1981 claim cannot flower.

In *Patterson,* an opinion handed down after the district court dismissed the instant complaint, the Supreme Court narrowed the list of activities proscribed by 42 U.S.C. § 1981, stating that "Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts." 109 S.Ct. at 2372. Once the existence of a contract is established, "[t]he right to enforce [it] does not ... extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights." *Id.* at 2373. *Patterson* raises obvious questions as to whether the complaint in this case implicates only "postformation conduct," a type of activity not subject to the prohibitions of § 1981. *Id.* at 2374. We leave those queries unanswered and abjure any attempt to chart more precisely the gulf which *Patterson* visualized between section 1981 and certain types of contract-related discrimination. Because we believe that insufficient facts are alleged to advance a cognizable claim of purposeful race-based discrimination, we need not explore the boundaries of section 1981 in these other respects.

### A

The viability of appellants' statement of claim depends on whether, given the facts averred, *their* race [3] can be said to have been an actual or decisive reason behind the alleged discrimination. *Rowlett v. Anheuser–Busch, Inc.,* 832 F.2d 194, 201 (1st Cir.1987). Put another way, the key question is whether plaintiffs assembled specific facts adequate to show or raise a plausible inference that they were subjected to race-based discrimination. *See Albert,* 851 F.2d at 573; *Dewey,* 694 F.2d at 3; *Fisher,* 598 F.2d at 665; *see also Keyes,* 853 F.2d at 1026.

The crux of the complaint is the charge that defendants, by pandering to the popular perception of the Cole confrontation as a racial incident and playing "racial politics," chilled expression and prevented plaintiffs from receiving a fair hearing. In that manner, defendants are alleged to have impermissibly "consider[ed] race as a factor in [the] discipline or discharge" of the Students. That is to say, by accusing plaintiffs of committing, and condemning them for, an allegedly racist act against a

---

**3.** White plaintiffs have been held to have stated a cause of action based on another person's race only in situations where they can claim persecution arising out of some special circumstance, say, their refusal to engage in intentional discrimination, *De Matteis v. Eastman Kodak Co.,* 511 F.2d 306, 312, *modified on other grounds,* 520 F.2d 409 (2d Cir.1975), or their special relationship with a minority, *Alizadeh v. Safeway Stores, Inc.,* 802 F.2d 111, 114 (5th Cir.1986), or their advocacy of minority rights, *Winston v. Lear–Siegler, Inc.,* 558 F.2d 1266, 1270 (6th Cir. 1977). No such circumstances pertain in this case. As pled here, it is the Students' race which must carry the load.

black professor, defendants are charged with having made the Students' white race a determining factor in the administration's handling of the matter and in a disproportionately severe punishment that followed. Had they been black or Professor Cole white, appellants' thesis runs, the sequelae would have been significantly less onerous. We find this to be a ketchup-bottle type of argument: it looks quite full, but it is remarkably difficult to get anything useful out of it.

Appellants' theory necessarily depends upon an unmitigated assumption: that, for the College to have branded appellants' behavior toward a black professor as "racist," it was necessary that they were white. The assumption is not only unproven, but unfounded, neither logically nor legally compelled. And, the reasoning associated with the assumption is sophistic. Racial difference is by no means a condition precedent to labelling an incident "racist;" nor are belligerent responses to perceived racial attacks, without more, presumed to be based on the *perpetrators'* race. Condemning acts as racist implies nothing about the actor's race, but signifies only that the *victim's* race was the cause of invidious harm. Persons of one race can discriminate against their fellows as easily as persons of a different race—and often, more cruelly. Simply put, racial polarity is not a prerequisite to the practice of racism.

Recognition of this homely truth undermines plaintiffs' position, no matter how purple the prose in which the complaint is couched. Discarding the flawed assumption, we are left with no more than conclu-

sory statements and subjective characterizations of the type regularly found wanting in civil rights cases. *See Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 108, 111 (1st Cir.1988); *Dewey*, 694 F.2d at 3; *Slotnick*, 560 F.2d at 33. Far from leading to a reasoned inference that the College was guilty of discrimination based on the Students' color, the administration's reaction (as plaintiffs described it) proves no more than that the College hierarchy perceived the Students' acts as racist and hence, deserving of harsher punishment than other infractions. That is short of the mark.[4] And the fact that the administration met with black undergraduates and tolerated—even abetted—a rally with an anti-racist theme directed at the Review, adds little to the mix. Neither general denunciations of racism nor refusals to meet with Review members—even white Review members—are enough to premise an inference of discrimination based on the Students' race. *See Jafree v. Barber*, 689 F.2d 640, 643 (7th Cir.1982) (requiring fact-specific allegations showing that "race was the *reason* for" the discrimination). As one court has written:

> Disputes generally arise out of mutual misunderstanding, misinterpretation and overreaction, and without more, such disputes do not give rise to an inference of discrimination.

*Johnson v. Legal Services of Arkansas, Inc.*, 813 F.2d 893, 896 (8th Cir.1987).

Appellants' iteration of certain procedural defects in the disciplinary proceedings and their claim that some COS members harbored anti-Review biases fall equally

---

**4.** Certainly, the caselaw lends no support to plaintiffs' argument that racial motivation can be shown merely by an accusation of racism. In their flagship case, *Lincoln v. Board of Regents*, 697 F.2d 928 (11th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983), the evidence established that school officials discharged a teacher, relying in part on accusations of racism contained in a student petition. *Id.* at 942 & n. 19. But in *Lincoln,* there was considerable proof that the charge was pretextual and defendants bigoted. There was evidence that they did not believe plaintiff to be racist, *id.* at 942 n. 20, 943; that one defendant had referred to plaintiff as "this white lady [who] came down here thinking she was going to get

some easy retirement;" *id.* at 943; and that another defendant had stated that he "hate[d] white people," *id.* It was in this larger context that the district court "may thus reasonably have inferred that a deeper significance rested in the allegations of [plaintiff's] racism." *Id.* at 942. In the case at bar, there are no facts set forth to show that the allegations of racism were not reflective of defendants' sincere (if, perhaps, mistaken) belief. Above all, plaintiffs' complaint contains no specific allegation which, alone or in combination with other well-pled facts, is capable of supporting an inference that any defendant possessed an anti-white racial animus.

flat. If true, such a litany may be indicative of prejudice toward plaintiffs, their ideology, and their journal. But it is far too long a leap to take these averments as evidence of race-based discrimination. Without more, allegations that perceived racist infractions were punished more harshly than other infractions do not tend to show racial discrimination against the persons accused. Weighting the scales heavily against those who are believed to practice race discrimination may seem to some inequitable, and unjustified; but fair or unfair, justified or not, differentials drawn along such an axis do not constitute the type of disparate treatment outlawed by section 1981. Unfairness alone does not invoke the statute. *See Keyes*, 853 F.2d at 1026; *Johnson*, 840 F.2d at 138; *see also Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1341 (1st Cir.1988) (employee may be fired "for any reason (fair or unfair) or for no reason," so long as firing not related to employee's age) (ADEA); *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986) (it is not enough that defendant "acted arbitrarily or with ill will") (ADEA). And merely juxtaposing the fact of one's race with an instance of discrimination is insufficient to state a claim. *Jafree*, 689 F.2d at 643; *see also Keyes*, 853 F.2d at 1027. Absent some meaningful, fact-specific allegation of a causal link between defendants' conduct and plaintiffs' race, the complaint's first count cannot stand.

B

Plaintiffs have a second string to their section 1981 bow. They argue that they stated a claim by describing defendants' handling of other incidents involving blacks and showing that, in contrast, the Students were disciplined much more sternly. These details, appellants asseverate, sustain an inference that defendants were guilty of race-based discrimination on this occasion. We examine the law and the well-pled facts.

It is apodictic that evidence of past treatment toward others similarly situated can be used to demonstrate intent in a race discrimination suit. *See Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977); *Albert*, 851 F.2d at 573; *Oliver*, 846 F.2d at 109; *Legal Services of Arkansas*, 813 F.2d at 896–97. To put flesh upon the bare bones of this theory, appellants' obligation was to identify and relate specific instances where persons situated similarly "in all relevant aspects" were treated differently, *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir.1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986); *see also Martin v. Citibank, N.A.*, 762 F.2d 212, 217 (2d Cir.1985), instances which have the capacity to demonstrate that the Students were "singled ... out for unlawful oppression." *Burt v. City of New York*, 156 F.2d 791, 791 (2d Cir.1946) (L. Hand, J.). In general, this requires that the other incidents' circumstances be "reasonably comparable" to those surrounding appellants' suspensions, and that "the nature of the infraction and knowledge of the evidence by college officials [be] sufficiently similar to support a finding of facial inconsistency." *Albert*, 851 F.2d at 573–74. The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

Once again, appellants' burden is in the typical Rule 12(b)(6) mold: to allege particulars sufficient to sanction a factfinder in drawing a reasonable inference of intentional disparate treatment based on race. For this purpose, appellants rely on (1) the flip side of the February 25 coin, and (2) an unrelated set of on-campus incidents. We deal separately with each grouping.[5]

5. Because we conclude that appellants have not    succeeded in their attempt to plead a case of

1. *Cole's Treatment.* Appellants point to what they style as "incongruities" between the administration's responses to Cole and the Students, respectively, in the wake of the February 25 interlude. The allegation's gist is that Cole behaved far worse than the Students, yet was treated far more solicitously. Taking this as true, plaintiffs are not assisted: the parties cannot fairly be equated. We agree with the district court that "a tenured faculty member and a student are not similarly situated simply because they were both involved in the same incident." 709 F.Supp. at 38.

Appellants argue that, though accurately stated, this distinction simply renders Dartmouth's discriminatory conduct all the more egregious; docents, after all, should be held to stricter standards than pupils. Such an argument succeeds simultaneously in proving too much and too little. It proves too much by conceding that Cole was to be treated according to a different behavioral standard while proving too little because the mere existence of disparate treatment—even widely disparate treatment—does not furnish adequate basis for an inference that the discrimination was racially motivated. *See, e.g., Keyes*, 853 F.2d at 1026–27.

2. *The Apartheid Protest.* Appellants fare no better in attempting to show disparate treatment by comparing the Cole confrontation, and its aftermath, with a controversy which racked the Dartmouth campus in 1985. At that time, several Dartmouth students employed various means, some disruptive in nature, to protest Dartmouth's investment in the stock of companies doing business in South Africa.

The demonstrators were apparently from diverse backgrounds, although plaintiffs allege that "many" of them were minorities. Among other things, the disaffected group erected shanties on campus and staged sit-ins at college offices. A policeman was assaulted when the protesters resisted efforts to remove the shanties. According to appellants, these activities violated a myri-

ad of student regulations, but no discipline was imposed and no criminal charges prosecuted.

But, this is no apple-to-apple match. Distinctions abound. Notwithstanding that undergraduates were involved in both controversies, we see no commonality sufficient to permit the close comparisons urged by plaintiffs. The participants in the 1985 protest movement were racially diverse. What is more, the complaint's detailed recital of the episode fails to adumbrate any direct, ongoing confrontation *between students and faculty* of a kind which would especially concern a college's administration; the faculty, after all, was not managing Dartmouth's endowment. Most importantly, the particularized, personal focus of plaintiffs' actions on February 25 sets the happening here at issue leagues apart from the mass protest activities.

Even bending backward as Rule 12(b)(6) suggests, neither series of events furnishes a viable, legally sufficient basis to animate appellants' disparate treatment theory. The delineated incidents, rather than meeting a "prudent person" test of comparability, *see supra* at 19, wander far afield. We agree with the Second Circuit that, if we allow a complaint like this to proceed in the context of student discipline,

> every conclusory selective-enforcement claim would lead to discovery concerning the entire disciplinary history of a college and then to a confusing, unmanageable and ultimately incoherent retrial of every disciplinary decision, including decisions not to investigate.

*Albert*, 851 F.2d at 574. We will not permit plaintiffs to embark on so wide-ranging a safari without some threshold demonstration that game of the desired type and kind has been seen lurking in the groves of academe.

### C

We recapitulate briefly. The complaint, read in the light most flattering to appellants, portrays a scenario in which white

---

race-based discrimination, *see infra,* we do not reach the question of whether intentionality was adequately alleged, addressing these proffered

comparisons only insofar as they purport to provide evidence of race-based discrimination.

students civilly approached a black professor who behaved badly in the face of what he mistakenly perceived as a racist attack. As word spread, the College community erupted in denunciation of what was widely thought to be a color-coded incident. In a highly charged atmosphere of racial tension, the College's president spoke out against the Review and its members, falsely implying that bigotry had played a part. The Review's "provocative" and "controversial" views were misinterpreted in some quarters—especially within the administration—as evidencing racial animus. With so stacked a deck, the claim runs, appellants could not have received a fair hearing from the COS—and they did not receive one.

If the facts are as alleged, thoughtful persons might well deplore defendants' behavior. By accepting the popular perception of events at face value, it is possible that the administration unfairly and incorrectly branded the Review, the Students, and their tactics, as racist. The complaint can even be read as unmasking viewpoint-based discrimination; the accusation levelled against the Students, and the sanctions that followed, may arguably have been used as weapons to silence or mute the Review's criticism, thereby chilling freedom of expression. Yet, no matter how flamboyant the rhetorical trappings in which plaintiffs' allegations are dressed, they do not state a federal-law claim. Although the complaint mentions that appellants are white, and claims that they were victims of discrimination, no specific facts are alleged which, if proven, could plausibly lead to a supportable finding that *plaintiffs' race* was the reason for the unfairness.

At the bottom line, appellants insist that 42 U.S.C. § 1981 reaches conduct stemming from the naked (mis)perception that certain persons harbor racist tendencies. They are wrong. The statute was designed to outlaw, and thereby to end, discrimination based on race. *Springer*, 821 F.2d at 880. It has been interpreted liberally in some respects, *see, e.g., St. Francis College*, 481

U.S. at 613, 107 S.Ct. at 2028 (for purposes of § 1981, "race" comprehends ethnicity); but the Court has never lost sight of the "racial character" of the rights which the law presumes to protect. *McDonald*, 427 U.S. at 293, 96 S.Ct. at 2585 (quoting *Georgia v. Rachel*, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966)). In our opinion, section 1981 is not so elastic as to accommodate plaintiffs' theory—and stretching it to fit would not only distort the statute's essential meaning, but would also hamstring its utility. After all, institutions must be reasonably free to investigate allegations of bias to ensure that racial discrimination is not being practiced on their turf. If every such investigation could be sidetracked by the accuseds' cries of racism, the cause of racial equality would unfairly be burdened. Section 1981 contemplates no such double agenda.

We neither minimize nor condone the evils inherent in the suppression of ideas. But, if expressive rights—rather than rights of a racial character—are genuinely at stake, appellants are not powerless to combat institutional overreaching or overly zealous academic disciplinarians. State-law anodynes exist for breach of contract, slander, malicious interference, and other torts.[6] Furthermore, if discriminatory conduct is viewpoint-based or infrigidates first amendment freedoms, then remedies may exist as against state actors or in connection with federally funded programs. *See, e.g., Doe v. University of Michigan*, 721 F.Supp. 852 (E.D.Mich.1989). Be that as it may, absent a plausible allegation of race-based discrimination, section 1981 is not properly includable in the armamentarium available to victims of unfair treatment. We have neither reason nor warrant to stand the statute on its head, as appellants would like, and force the square peg of viewpoint-based discrimination into section 1981's circular maw.

### IV

■ We mention count II of plaintiffs' complaint only in passing. That count pur-

---

6. In this case, plaintiffs have premised federal court jurisdiction on 28 U.S.C. § 1331. Whether plaintiffs have a cause of action under New

Hampshire law (we are told they have a case pending in the state courts) is not before us, and we take no view of the question.

ports to allege violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1982).[7] To state a claim under Title VI, as under 42 U.S.C. § 1981, a complaint must adequately allege discrimination based on a protected category (race, color, or national origin); and must do so with the same degree of factual specificity as required in civil rights cases generally. *See Latinos Unidos de Chelsea v. Secretary of Housing,* 799 F.2d 774, 785 (1st Cir.1986); *Coates v. Illinois State Bd. of Educ.,* 559 F.2d 445, 447, 449 (7th Cir.1977); *see also supra* Part II (describing pleading standard).

Count II is bottomed on exactly the same factual foundation as count I. Because we have already concluded that the facts so alleged fail to permit an inference of race-based or color-based discrimination, *see supra* Part III, and because appellants do not claim discrimination based on national origin, the district court was correct in concluding that count II was susceptible to defendants' dismissal motion.[8]

## V

■ We have one more bridge to cross before arriving at a final destination. In a last-ditch effort to salvage the case, appellants ask, should we uphold the ruling below, that we "direct ... the district court [to] grant leave to the Students to amend their Complaint." We decline the invitation.

To be sure, the Civil Rules provide that a "party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served...." Fed.R.Civ.P. 15(a). And, defendants filed no "responsive pleading" here. *See McDonald v. Hall,* 579 F.2d 120, 121 (1st Cir.1978) (a motion to dismiss is not a "responsive pleading" within the Rule). Yet, the thrust of Rule 15(a) is aimed at the pre-judgment phases of litigation. *See James v. Watt,* 716 F.2d 71, 77 (1st Cir. 1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). In this case, plaintiffs elected not to amend as of right before the district court spoke; and thereafter, they filed no motion below for leave to amend. In this circuit, "it is a party's first obligation to seek any relief that might fairly have been thought available in the district court before seeking it on appeal." *Beaulieu v. United States Internal Revenue Service,* 865 F.2d 1351, 1352 (1st Cir.1989); *see also Aoude v. Mobil Oil Corp.,* 862 F.2d 890, 896 (1st Cir.1988). Thus, here—as in *Beaulieu*—the question of "[w]hether it might have been error for the court to have denied leave to amend is not before us," because "plaintiff[s] never requested it." 865 F.2d at 1352.[9]

After judgment has entered and jurisdiction has been transferred to an appellate court, amendments are still possible—but, as the case passes through various litigatory stages, the pleader's burden grows progressively heavier. The instant request emerges fairly well along the continuum: judgment entered below; no motion was filed post-judgment asking the district court for leave to amend; during the appeal's pendency, no effort was made to secure a remand for the purpose of seeking

7. The statute provides:
No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
42 U.S.C. § 2000d.

8. We leave for another day a number of ancillary issues raised by the parties in connection with count II, including whether discrimination, to be actionable under Title VI, must be intentional; and whether the named defendants are proper parties to a Title VI claim.

9. Appellants seek to excuse this omission on the ground that, in light of the district court's opinion, requesting leave to amend would have been futile. That dog will not hunt. Nothing in the lower court's opinion or elsewhere in the record supports the idea. To the contrary, the district judge appears to have been meticulous in protecting the parties' rights and in holding the balance steady and true. There is no sign his heels were dug in. Furthermore, any uncertainty in this regard must be resolved against appellants. Parties who decide not to seek permissive relief in the trial court must clearly understand that they will have an uphill fight in this circuit to convince the court of appeals to consider a request for the relief as a matter of first impression.

permission to amend; and the case has now been fully briefed and argued. We have confronted such cases before, and a rule of thumb has evolved. "When, in the ordinary case, 'the pleader has stood upon his pleading and appealed from a judgment of dismissal, amendment will not ordinarily be permitted ... if the order of dismissal is affirmed.'" *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635–36 (1st Cir.1988) (quoting 3 J. Moore, *Moore's Federal Practice* ¶ 15.11 at 15–109 (1983)). Our approach is not totally inflexible; amendments will sometimes be allowed, but such instances comprise the long-odds exception, not the rule. The touchstone is equitable and case-specific: leave to amend will be granted sparingly and only if "[j]ustice ... requires further proceedings." *Id.* at 636.

This case presents us with nothing powerful enough to trigger the narrow exception to the general rule. There is no indication that appellants were laboring under any disability, or that the district court may have missed a plausible though ambiguously stated theory, *see, e.g., Rivera–Gomez*, 843 F.2d at 636; *Albert*, 851 F.2d at 574, or that some new concept has surfaced, making workable an action previously in the doldrums, *see, e.g., Pross v. Katz*, 784 F.2d 455, 459–60 (2d Cir.1986). To this day, appellants have given no meaningful indication that additional facts could be pleaded which would make a dispositive difference. From what little we have been told, the "new" facts are of the same genre as the "old" facts—sufficient, if believed, to show that the Students were treated unfairly, but insufficient, whether or not believed, to show that the unfairness stemmed from a preoccupation with plaintiffs' race. Here, as in *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 88 (2d Cir.), *cert. denied*, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961), "we are not told how [a cause of action] could be [pleaded], the plaintiff[s'] own allegations strongly suggest it could not, and defendants' interests are entitled to recognition as well as plaintiff[s']."

In fine, no satisfactory reason appears why plaintiffs, if desirous of amending, should not have followed the usual course and asked the district court for permission. Given their default in that regard, the ab-

sence of special circumstances, and what appears to be an altogether unpromising prospect for amendment in any event, the interests of justice would be served poorly by an order allowing plaintiffs to amend at this late date. Finality is a critically important concept in our system of jurisprudence. At some point, battles must end.

## VI

To sum up, we see neither smoke nor fire. Although plaintiffs may have been penalized for their speech and ideas—a matter which we do not address—the aggregate facts described in the complaint fail to sustain a reasonable inference that they were victims of race-based discrimination. Whether the defendants treated the Students fairly or unfairly is not the question in this case. Either way, the College's handling of the matter, as limned in the complaint, fell outside the purview of 42 U.S.C. § 1981 and Title VI. It follows, then, that the complaint was properly dismissed. And, the record reflects no circumstances so exceptional as to warrant permitting plaintiffs to amend, bypassing the rule that requests for relief ought to be addressed first to the trial judge and, in the bargain, undermining the accustomed finality of judicial decisions.

We need go no further. The judgment below must be *Affirmed.*