William Thomas FOX, and Scott Everett Sanders, Plaintiffs,

v.

The CITY OF GREENSBORO, a municipality, Timothy R. Bellamy individually and in his official capacity as the Chief of the Greensboro Police Department, Gary W. Hastings, individually and in his official capacity as Assistant Chief of the Greensboro Police Department, John D. Slone, individually and in his official capacity as an officer of the Greensboro Police Department, Ernest L. Cuthbertson, individually and in his official capacity as an officer of the Greensboro Police Department, Mitchell Johnson, individually and in his official capacity as the city manager of the City of Greensboro, Martha T. Kelly individually and in her official capacity as Internal Affairs Captain of the Greensboro Police Department, and Risk Management Associates, Inc., Defendants.

No. 1:10–CV–229.

United States District Court, M.D. North Carolina.

Aug. 27, 2011.

John C. Vermitsky, Morrow Porter Vermitsky & Fowler, PLLC, Winston–Salem, NC, for Plaintiffs.

Alan W. Duncan, Allison O. Van Laningham, Smith Moore LLP, Greensboro, NC, Grover Gray Wilson, Wilson Helms & Cartledge, L.L.P., Winston–Salem, NC, Elizabeth A. Sprenger, James William Pope, Golding Holden & Pope, LLP, Charlotte, NC, for Defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This action is one of several filed in this court by both black and white officers of the Greensboro Police Department ("GPD") alleging racial discrimination and other wrongdoing.[1] Before the court are various motions to dismiss filed by Defendants John D. Slone ("Slone")[2] and Ernest L. Cuthbertson ("Cuthbertson") (Doc. 39), Timothy R. Bellamy ("Bellamy"), Gary W. Hastings ("Hastings"), and Martha T. Kelly ("Kelly") (Doc. 40), Mitchell Johnson ("Johnson") (Doc. 41), The City of Greensboro ("the City") (Doc. 43), and Risk Management Associates, Inc. ("RMA") (Doc. 45). Plaintiffs William Thomas Fox ("Fox") and Scott Everett Sanders ("Sanders") (collectively "Plaintiffs") oppose each motion. (Docs. 48 to 55.) For the reasons below, the motions will be granted as to Plaintiffs' federal claims. The court will decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims, which will be dismissed without prejudice.

## I. BACKGROUND

Plaintiffs commenced this action on March 23, 2010. (Doc. 1.) Defendants responded with motions to dismiss the Complaint, largely on the ground that it contained conclusory contentions that failed to allege sufficient facts to state a claim upon which relief could be granted. (Docs. 11, 13, 15, 17; see Doc. 34.) In reaction to the motions, Plaintiffs sought and were granted leave of court to amend the Complaint to "add[ ] factual allegation[s] that clarify and amplify the factual basis for Plaintiffs' allegations." (Doc. 20; see Doc. 36.) Plaintiffs' Amended Complaint was filed on April 1, 2011 (Doc. 37), and Defendants have restyled their motions to dismiss toward it (Docs. 39, 40, 41, 43, 45). For purposes of the current motions, the court views all factual allegations, which are stated below, in the light most favorable to Plaintiffs as the nonmoving parties. See Ibarra v. United States, 120 F.3d 472, 474 (4th Cir.1997).

Plaintiffs are employed by the City as GPD officers. At the time of the alleged events, Fox was a Sergeant with twenty-two years of police experience, and Sanders was a Detective with seventeen years of experience. Both are white.

In June 2005, certain black GPD officers accused GPD Chief David Wray ("Wray") of maintaining a "secret police" unit of white officers within the GPD (also referred to as Wray's "good ole boys") to racially target black officers. These complaining black officers contended that Wray's "secret police" unit was composed of officers from the Special Investigations Section ("SIS") of the GPD's Special Investigations Division, to which Plaintiffs were assigned. Among the accusations against Wray and his "secret police" were

---

1. E.g., Alexander v. City of Greensboro, No. 1:09–CV–293 (M.D.N.C.); Alexander v. City of Greensboro, No. 1:09–CV–934 (M.D.N.C.); Fulmore v. City of Greensboro, No. 1:09–CV–373 (M.D.N.C.); Wray v. City of Greensboro, No. 1:09–CV–095 (M.D.N.C.).

2. Although the Amended Complaint uses the spelling "Sloan," the parties' briefing indicates that the correct spelling is "Slone" (see, e.g., Doc. 39 at 1; Doc. 48 at 1; Doc. 54 at 1), which will be used in the opinion.

claims that they compiled a "black book' that allegedly targeted minority officers." (Doc. 37 ¶ 21.) The "secret police" also allegedly conducted improper investigations of several black officers, including Officers James Hinson ("Hinson") and Julius Fulmore ("Fulmore").

Plaintiffs contend that the SIS investigated only legitimate crimes, including allegations of criminal police misconduct. According to Plaintiffs, no "black book" ever existed, although they did have a black binder they contend was a proper investigative tool created in response to a complaint by an alleged victim of sexual assault by a black officer. The black binder contained photos of only those black officers on duty at the time of the alleged assault and was shown only to the alleged victim as part of a legitimate investigative effort.

Plaintiffs claim that despite Defendants' awareness that the black binder was a legitimate investigative tool, Defendants "continuously and maliciously have presented this photo array as the purported black book' in an effort to defame and discredit" Plaintiffs. (*Id.* ¶ 23.) Moreover, although Defendants allegedly knew or should have known that the ongoing accusations that Plaintiffs acted with racial motivations were unfounded, Defendants "discriminated against Plaintiffs based on their race by helping to promulgate the allegations of racially motivated conduct in an attempt to garner support within a segment of the African American community and placate Hinson and the complaining African American officers." (*Id.* ¶ 25.)

"Upon information and belief," Plaintiffs allege, Johnson, the Greensboro City Manager, "with racial animus" directed the City Attorney to meet secretly with the complaining black officers' lawyers. (*Id.* ¶ 26.) While this meeting was purportedly to discuss the complaining offi-

cers' concerns, Plaintiffs surmise that its true purpose was to obtain information to use against Wray, Fox, and Sanders. Subsequently, "[u]pon information and belief" and "as part of an illegal plan," Johnson allegedly directed the City Attorney's Office to conduct an investigation "for purposes of discrediting David Wray and his administration, including specifically [Plaintiffs]." (*Id.* ¶ 27.) As part of this investigation, Johnson and the Greensboro City Council contracted with RMA, a third party, to provide a "purportedly objective overview of the investigation process," yet the City Attorney's investigation and RMA's investigation both contained "numerous factual errors and unjustified conclusions" and were "manipulated and controlled" by Johnson, Bellamy (then Assistant Chief), and Hastings (then Captain) to justify removing Fox and Sanders. (*Id.* ¶¶ 28–29.) As an example, Plaintiffs allege, RMA administered a polygraph examination in a manner that did not accord with the bylaws of the American Association of Police Polygraphists and N.C. Gen.Stat. § 74C–8(d)(2).

The City ultimately settled with Hinson. In exchange for his promise not to sue the City, it (through Johnson) agreed to return him to active duty, purge all records of his investigations, and advance his career within the GPD. Johnson also allegedly agreed to force Wray and his "good ole boys" in the SIS from the GPD. This specifically included Plaintiffs "because they were Caucasian[,] and Defendants[ ] wanted to make an example out of Caucasian officers." (*Id.* ¶ 31.)

On January 9, 2006, Wray was forced to resign, and the City appointed Bellamy as Acting Chief and then Chief. The Federal Bureau of Investigation ("FBI") investigated possible violations of federal civil rights law by Wray, Fox, Sanders, and the SIS,

**482**

but found no evidence of any violations of federal law. (*Id.* ¶ 36.)

Subsequently, at Bellamy's direction and with Hastings' backing, the City requested the North Carolina State Bureau of Investigation ("SBI") to investigate Fox, Sanders, and the SIS. Plaintiffs contend that Johnson knew or should have known that the SBI investigation was unfounded, but he backed Bellamy's decision by giving him the reports from the City Attorney and RMA, instructing Bellamy "to see if the issues in the report[s] were true and accurate and to report back to Johnson and tell him what he was going to do about it." (*Id.* ¶ 38.) When Bellamy "reported that the issues were true," Johnson directed him to initiate an SBI investigation. (*Id.*)

During its investigation, the SBI interviewed many GPD officers, including Bellamy, Hastings (who now commanded SIS and eventually became Assistant Chief), Slone, and Cuthbertson. Plaintiffs charge that Bellamy, Hastings, and Kelly (then a GPD Internal Affairs Captain) conspired "to deprive the Plaintiffs of their constitutionally protected rights and to maliciously and without probable cause, initiate and continue criminal charges against the Plaintiffs." (*Id.* ¶ 40.) At Hastings' request, Plaintiffs contend, Kelly destroyed a document—identified only as "Memorandum # 9"—which pertained (in an unstated way) to the SBI investigation.[3] Also, Plaintiffs contend, Kelly "failed to notify the SBI of false criminal and administrative allegations brought forth by Gary Hastings which concerned Plaintiff Sanders." (*Id.*) "Upon information and belief,"

Plaintiffs charge, Hastings, because of Wray's previous discipline of him, had a "personal vendetta" against Wray and his "good ole boys," including Plaintiffs. (*Id.* ¶ 42.)

Also "[u]pon information and belief," Johnson, Bellamy, Hastings, Slone, and Cuthbertson "entered into an illegal agreement and discussed, created and implemented a plan to prevent information that would be favorable to the Plaintiffs from being given to the investigating SBI officers and provided the SBI with false, incomplete, and/or misleading statements and information in an attempt to discredit and bring charges against [Plaintiffs] because of their race."[4] (*Id.* ¶ 43.) Slone and Cuthbertson allegedly discussed with "Hastings and/or Bellamy and/or any other Defendant" what information to provide to the SBI and what information to withhold. (*Id.* ¶ 44.) Slone and Cuthbertson allegedly gave "[f]alse interviews" to the SBI, while prior "inconsistent statements" by them were withheld from Plaintiffs and the SBI by "collective decision of the Defendants." (*Id.* ¶ 50.) "Upon information and belief," allegedly false information was "provided by and/or approved or condoned by" Johnson, Bellamy, Hastings, Slone, and Cuthbertson and included "[t]he suppression of internal memoranda," although only "Memorandum # 9" is named, and "information regarding the true purpose of the alleged black book.'" (*Id.* ¶ 46.) Hastings is also said to have sent two officers to interview a witness about the "black book" but, with Bellamy's consent, suppressed the notes from that interview.

---

**3.** The Amended Complaint does not allege the contents of "Memorandum # 9" or how, if at all, it pertained to the other allegations.

**4.** This is alleged elsewhere as follows: "Defendants Johnson, Hastings, Bellamy, [Slone], and Cuthbertson did together illegally agree,

plan, and discuss to control the flow of information to the SBI and to manipulate the information in such a way as to only provide negative information and to withhold positive information regarding the Plaintiffs to the SBI." (Doc. 37 ¶ 50.)

Fox ultimately was indicted in North Carolina state court for "Felonious Obstruction of Justice" and "Felonious Conspiracy," while Sanders was indicted for "Accessing a Government Computer Without Authorization," "Felonious Obstruction of Justice" (two counts), and "Felonious Conspiracy." (*Id.* ¶¶ 46, 52.) Warrants were issued for their arrest, and on September 21, 2007, Plaintiffs were arrested, fingerprinted, and photographed by the SBI.[5] (None of the individual Defendants made the arrests.) Plaintiffs were released after signing a written promise to appear. That same day, Bellamy suspended them without pay pending the adjudication of their criminal charges and an administrative investigation.

Sanders was brought to trial. On February 20, 2009, after a five-day jury trial, he was acquitted of the "Accessing a Government Computer Without Authorization" charge. According to Plaintiffs, as a result of Sanders' *Brady* motion,[6] the SBI "received statements, which had been suppressed by the Defendants[,] that led to all charges against [Plaintiffs] being dismissed by the SBI." (*Id.* ¶ 52.)

Plaintiffs allege that their indictments and arrests were "a result of the false, misleading, and incomplete evidence provided by the Defendants," that the indictments lacked probable cause, and that "the lack of probable cause was known to the City, [GPD], Bellamy, Johnson, Cuthbertson and Hastings prior to the indictments being obtained." (*Id.* ¶¶ 46–48.) Throughout these proceedings, the City has refused to defend Plaintiffs in connection with their arrests, Sanders' trial, and a civil action against them by Fulmore, causing them to bear the cost of their defenses. The City's refusal to pay allegedly contradicts a 1980 City Resolution and is "because they are Caucasian." (*Id.* ¶ 56.)

Fox and Sanders now bring the following federal claims: violation of 42 U.S.C. § 1981 by the City and Johnson (Counts Two & Three); violation of the Fourth Amendment by the City,[7] Johnson, Bellamy, Hastings, and Kelly (Counts Four & Five); and violation of 42 U.S.C. § 1985 by Johnson, Bellamy, Hastings, Kelly, Slone, Cuthbertson, and RMA (Counts Six & Seven). Plaintiffs also allege a variety of state-law claims against various combina-

---

5. Although the Amended Complaint implies at one point that Plaintiffs were indicted on October 17, 2007 (*see* Doc. 37 ¶¶ 45–46), Plaintiffs indicate elsewhere that the indictments occurred before the arrests (*see, e.g., id.* ¶¶ 77, 85). Consistent with the latter allegations, this court takes judicial notice of the state-court record reflecting that Plaintiffs were indicted on *September* 17, 2007. *Cf., e.g., United States v. Black,* 490 F.Supp.2d 630, 640 n. 3 (E.D.N.C.2007) (taking judicial notice of documents from the record of a related state-court criminal proceeding).

6. That is, a motion for production of the government's evidence favorable to the accused, pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. The City previously questioned whether it is a Defendant as to the Fourth Amendment

claim, because the captions for Counts Four and Five do not list the City, and Plaintiffs did not correct this in their Amended Complaint. The text of Count Four, however, mentions the City several times (*see* Doc. 37 ¶¶ 77–78, 80), Plaintiffs' response to the City's motion to dismiss clearly mentions a Fourth Amendment claim against the City (*see* Doc. 51 at 1–2), and the City effectively conceded the point in its reply brief (*see* Doc. 65 at 7–9). Moreover, the claim is brought against several individual Defendants in their official capacities, and "[o]fficial-capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (internal quotation marks omitted).

tions of Defendants: declaratory judgment regarding indemnification of litigation expenses (Count One); malicious prosecution (Counts Eight and Nine); abuse of process (Counts Ten and Eleven); negligence (Count Twelve); defamation (Count Thirteen); civil conspiracy (Counts Fourteen and Fifteen); and punitive damages (Count Sixteen).

Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[8] (Docs. 39, 40, 41, 43, 45.) These motions have been fully briefed and are ready for decision.

## II. ANALYSIS

### A. Standard for Rule 12(b)(6) Motions

The purpose of a motion under Federal Rule of Civil Procedure 12(b)(6) is to "test[ ] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, *Ibarra*, 120 F.3d at 474.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47,

78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated on other grounds by Twombly*, 550 U.S. 544, 127 S.Ct. 1955), a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.* Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[ ] the[ ] claims across the line from conceivable to plausible." *Id.* at 555, 570, 127 S.Ct. 1955; *see Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949–51, 173 L.Ed.2d 868 (2009).

■ Employment discrimination claims carry no heightened pleading standard, *see Twombly*, 550 U.S. at 569–70, 127 S.Ct. 1955, and an employment discrimination complaint need not contain specific facts establishing a prima facie case, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Yet the Fourth Circuit has not interpreted *Swierkiewicz* as removing the burden of a plaintiff to plead facts sufficient to state all the elements of his claim. *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764–65 (4th Cir.2003) (holding that the plaintiff failed to allege facts sufficient to support all the elements of her hostile work environment claim); *see also Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 346–47 (4th Cir.2006) (affirming the dismissal of a 42 U.S.C. § 1981 discrimination claim because the complaint did not allege facts supporting the assertion that race was a motivating factor in the plaintiff's termination).

### B. Violation of 42 U.S.C. § 1981 (Counts Two & Three)

Plaintiffs allege that the City and Johnson (in his official and individual capacities)

---

**8.** The City also moves to dismiss certain state-law claims pursuant to Federal Rule of Civil Procedure 12(b)(1).

discriminated against them on the basis of race in violation of 42 U.S.C. § 1981. The City and Johnson contend that Plaintiffs have failed to state a claim because they do not allege facts plausibly showing that any actions taken against them were motivated by their race.

### 1. Applicable Law

[redacted] Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). The Supreme Court has held that the protections of § 1981 apply to white citizens as well as to nonwhites. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 286–87, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

[redacted] This statute has long been held to prohibit an employer from discriminating against an employee based upon the employee's race. *See, e.g., Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Where suit is brought against a state actor, as with Plaintiffs' claims against the City and against Johnson in his official capacity,[9] "[42 U.S.C.] § 1983 is the exclusive federal remedy for violation of the rights guaranteed in § 1981.'" *Dennis v. Cnty. of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995) (quoting *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

[redacted] To state a cause of action under § 1983 against a municipality, Plaintiffs must plead "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan ex rel. Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir.1994). The "official policy or custom" requirement may be satisfied by, among other things, a sufficient allegation that the adverse actions taken against Plaintiffs were attributable to the decisions of a municipal official with final policymaking authority. *See Carter v. Morris,* 164 F.3d 215, 218 (4th Cir.1999); *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro,* 64 F.3d 962, 965–66 (4th Cir.1995). Here, Plaintiffs properly bring their § 1981 claim by way of a § 1983 claim (*see* Doc. 37 ¶ 67), and they allege that the actions purportedly taken against them in violation of § 1981 were taken by Johnson pursuant to his "final policy making authority" as City Manager (*id.* ¶ 65). Defendants have not challenged this allegation, and the court will assume for purposes of the Rule 12(b)(6) motions that Plaintiffs have sufficiently alleged an "official policy or custom."[10] The remaining issue is whether Plaintiffs have sufficiently alleged that their rights under § 1981 were actually violated.

Plaintiffs' § 1981 claim against Johnson in his individual capacity has been brought by way of § 1983 as well. (*See id.* ¶¶ 71,

9. "Official-capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." *Graham,* 473 U.S. at 165, 105 S.Ct. 3099 (internal quotation marks omitted).

10. Plaintiffs' allegation is consistent with the Fourth Circuit's holding in *Fire Fighters Ass'n* that "[i]n the City of Greensboro only the City Manager and the City Council possess the authority to fashion policy with regard to employer-employee relations in all city departments." 64 F.3d at 965 (emphasis omitted); *see Alexander v. City of Greensboro,* 762 F.Supp.2d 764, 782–83 (M.D.N.C.2011).

73.) This requires allegations (1) that Johnson "deprived [Plaintiffs] of a right secured by the Constitution and laws of the United States," and (2) that the deprivation was performed under color of state law. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir.2009). Johnson does not contest the second prong, so the court must only determine whether Plaintiffs have adequately alleged deprivation of a federal right—namely, their right under § 1981 not to be discriminated against on the basis of race. Because the § 1981 claims against the City and Johnson in his official capacity also turn upon this same issue and rely upon the same allegations, the § 1981 claims will all be considered together.

### 2. Racial Motivation

Plaintiffs contend that they have alleged sufficient facts to support a plausible inference of discrimination motivated by Plaintiffs' race. Certainly, the Amended Complaint contains numerous conclusory assertions of racial discrimination. (*See, e.g.*, Doc. 37 ¶ 26 ("[Plaintiffs] would not have been wronged and these tortuous [sic] actions would not have been taken against them had they not been Caucasian."); *id.* ¶ 33 ("[Plaintiffs] were targeted because they are Caucasian officers who were part of SIS at the time of the Hinson investigation."); *id.* ¶ 42 ("[Hastings'] vendetta [against Wray's associates] coupled with racial animus led [him] to take the actions complained upon in this complaint.").) Defendants argue, however, that the Amended Complaint lacks adequate factual allegations plausibly supporting these conclusions.

A plaintiff asserting a § 1981 disparate treatment claim in the employment setting [11] must allege that the defendants' adverse employment actions against him were "because of his race" and that "the[ ] discrimination was intentional." [12] *Jordan,*

11. The Amended Complaint does not clarify the theory underlying Plaintiffs' § 1981 claims, but it mentions "adverse actions" (or a variant) several times, pointing to a disparate treatment theory. (*See* Doc. 37 ¶¶ 65, 66, 70.) The Amended Complaint clearly does not support a retaliation theory, which requires an allegation that Plaintiffs engaged in a "protected activity." *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190–91 (4th Cir.2010), *cert. granted*, —— U.S. ——, 131 S.Ct. 3059, 180 L.Ed.2d 884 (2011). Nothing in the Amended Complaint or Plaintiffs' briefing hints at a hostile work environment theory, either.

12. Defendants do not challenge whether, and thus the court assumes without deciding that, Plaintiffs have satisfied the requirement that they allege an "adverse employment action" against them, although this is far from clear. An "adverse employment action" is "a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (alteration in original) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004)). While "[c]onduct short of ultimate employment decisions can constitute adverse employment action," *James*, 368 F.3d at 375–76 (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)) (internal quotation marks omitted), the "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion," *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir.1999). Plaintiffs' § 1981 claim is brought only against Johnson and the City (based on Johnson's actions (*see* Doc. 37 ¶¶ 65–67)), yet none of Johnson's alleged actions satisfies the definition of "adverse employment action." He allegedly initiated multiple investigations of the accusations against Plaintiffs (*see id.* ¶¶ 26–29, 38–39), but these did not constitute "adverse employment actions." *See, e.g., Dawson v. Rumsfeld*, No. 1:05–CV–1270, 2006 WL 325867, at *6 (E.D.Va. Feb. 8, 2006); *Hoff-*

458 F.3d at 345 (emphasis omitted) (citing *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam)). Conclusory allegations do not satisfy these requirements, however. *See id.* at 345–47. Rather, Plaintiffs' Amended Complaint must contain some supporting factual material to render their conclusory allegations plausible. *See, e.g., Coleman v. Md. Court of Appeals*, 626 F.3d 187, 189–91 (4th Cir.2010) (affirming the Rule 12(b)(6) dismissal of a disparate treatment claim for failure to "establish a plausible basis for believing . . . that race was the true basis for [the black plaintiff's] termination," where an employee disciplined by the plaintiff retaliated by spreading false allegations about the plaintiff, the plaintiff's white supervisor allegedly spread these rumors despite knowing their falsity, the plaintiff subsequently received a reprimand letter on another matter despite satisfying the applicable performance standards, and the white supervisor told the plaintiff, when he submitted a sick-leave request, that he would be terminated if he did not resign), *cert. granted*, —— U.S. ——, 131 S.Ct. 3059, 180 L.Ed.2d 884 (2011) (granting certiorari on another issue); *Francis v. Giacomelli*, 588 F.3d 186, 189–91, 195–96 (4th Cir.2009) (affirming the Rule 12(b)(6) dismissal of a § 1981 discrimination claim on the ground the allegations were "conclusory" and "nothing more than the sort of unadorned allegations of wrongdoing to which *Twombly* and *Iqbal* are directed," where the black plaintiffs—a police commissioner and his deputy—were terminated after a dispute with the white mayor over an internal investigation became public, the mayor dispatched officers to relieve the plaintiffs of their badges and weapons and to escort them from the police building, and the plaintiffs asserted that no such actions had ever been taken against white officers);[13] *Jordan*, 458 F.3d at 344–47 (affirming the Rule 12(b)(6) dismissal of a § 1981 discrimination claim because the black plaintiff could not "simply rest[ ] on his . . . conclusory statement that his race was a motivating factor' for his firing," where the plaintiff heard a coworker make a racially offensive remark, he reported the remark to other coworkers and several managers, his employers allegedly retaliated against him by changing his schedule and job assignments, and a month later his employers fired him because he was "disruptive," his position "had come to an end," and management "don't like you and you don't like them," although the plaintiff alleged that these reasons were a pretext).

■ Here, Plaintiffs' only factual allegations involving race are that black GPD officers leveled accusations of racist con-

man v. Balt. Police Dep't, 379 F.Supp.2d 778, 792 (D.Md.2005). He allegedly agreed with Hinson to force Plaintiffs out of the GPD (*see* Doc. 37 ¶ 31), but Plaintiffs do not allege that they were ultimately forced out of the GPD. With other Defendants, he allegedly spread false allegations of racism about Plaintiffs (*see id.* ¶¶ 23, 25), but Plaintiffs draw no connection between this and the terms of their employment. *Cf., e.g., James*, 368 F.3d at 377 (holding that a poor performance evaluation causing a loss of prestige or status without detrimentally altering the plaintiff's employment terms or conditions is not actionable). Plaintiffs' unpaid suspensions are likely "adverse employment actions," but the Amended Complaint explicitly attributes them to Bellamy, not Johnson. (*See* Doc. 37 ¶ 49.) While Plaintiffs allege vaguely that Johnson conspired with other Defendants to distort the SBI investigation to Plaintiffs' detriment (*see id.* ¶¶ 43, 46, 50), they allege no specific actions by Johnson.

13. Alternatively, the Fourth Circuit held that the allegations were "patently untrue," because a second deputy, who was not alleged to be black, complained of exactly the same treatment in other counts of the complaint. *Francis*, 588 F.3d at 195.

488

duct against Wray and several white officers, particularly Plaintiffs (*see* Doc. 37 ¶¶ 18–19, 21), that these accusations were untrue (*see id.* ¶¶ 20, 22–24), and that the accusations triggered everything that followed, including several investigations of Plaintiffs' alleged activities and ultimately criminal charges against Plaintiffs. Plaintiffs urge the court to infer from this that all alleged actions of Johnson (and through him, the City) were motivated by Plaintiffs' race. The plausible inference supported by these allegations, however, is that Johnson's alleged actions were motivated not by Plaintiffs' race, but by Plaintiffs' alleged *racism.*

Even accepting Plaintiffs' conclusory assertions that Johnson knew the accusations against them were unfounded but continued to spread and investigate them "to garner support within a segment of the African American community and placate Hinson and the complaining African American officers" (*id.* ¶ 25; *see id.* ¶¶ 23, 66, 70), this merely alleges that, faced with an intradepartmental conflict between Wray and a number of GPD officers, Johnson sided with the other officers against Wray and his closest associates. Even if John-

son's motives for this decision were improper—for example, political expediency or a personal vendetta against Wray (*cf. id.* ¶¶ 78, 86 (listing these as additional reasons for Defendants' alleged actions))—none of the Amended Complaint's factual allegations suggests that *Plaintiffs' race* was one of those motives. Nor do Plaintiffs allege any facts indicating that the complaining black officers themselves were motivated by Plaintiffs' race rather than by Plaintiffs' alleged racism or that Johnson would have acted differently had Plaintiffs been black officers accused of racist activities.[14]

To be sure, race need not have been the sole motivating factor behind Johnson's alleged actions. *See, e.g., Disher v. Weaver,* 308 F.Supp.2d 614, 622–23, 622 n. 4 (M.D.N.C.2004). But Plaintiffs must allege facts plausibly showing that it was one of the motivating factors. Here, after the allegations mentioned above, Plaintiffs do not mention their race again except in numerous conclusory assertions punctuating the Amended Complaint at regular intervals. (*See, e.g.,* Doc. 37 ¶¶ 26, 31, 33, 42, 43, 56, 66, 67, 70, 73.)[15] These asser-

14. *Cf. Sharp v. BellSouth Adver. & Publ'g Corp.,* 232 F.Supp.2d 1369 (N.D.Ga.2002), *aff'd,* 61 Fed.Appx. 671 (11th Cir.2003) (per curiam) (unpublished table decision). In *Sharp,* the white plaintiff was fired based purportedly on accusations by black employees of inappropriate touching. *Id.* at 1373. She alleged that this justification was a pretext for her firing due to her race and that her employer merely wanted to appease black employees who were complaining about her. *Id.* at 1373, 1376. The court held, albeit on summary judgment, that the facts failed to support an inference of racial discrimination. *Id.* at 1376–77. It observed that the plaintiff's implicit contention was "that the defendant would not have been so concerned had the complaints been made by a group of white people" but that any inference to this effect or that the defendant would have responded differently had the plaintiff been black would be "speculation." *Id.* at 1377.

15. Many of these assertions were not in Plaintiffs' original Complaint but were added to the Amended Complaint, as if by dint of repetition they would be rendered less conclusory. For example, paragraph 31 of the original Complaint alleged that Johnson reached an agreement with Hinson to force Wray and his associates from the GPD. (Doc. 1 ¶ 31.) Paragraph 31 of the Amended Complaint contains the same allegation but adds a final clause asserting that this was done "because [Plaintiffs] were Caucasian and Defendants[ ] wanted to make an example out of Caucasian officers." (Doc. 37 ¶ 31.) Similarly, the original paragraph 43 alleged vaguely that Bellamy, Hastings, Slone, and Cuthbertson provided "false, incomplete, and/or misleading statements and information" to the SBI to harm Plaintiffs. (Doc. 1 ¶ 43.) The amended paragraph 43 adds Johnson to the allegation

tions are often no more than phrases like "because of [Plaintiffs'] race" (*id.* ¶ 43) or "with racial animus" (*id.* ¶ 26) inserted into otherwise unrelated allegations. Such statements carry no more weight than the plaintiff's allegation in *Jordan* that his "race was a motivating factor in the conduct and decisions of [the defendants]," which was held insufficient to state a claim for racial discrimination. 458 F.3d at 344–47; *see also Iqbal*, 129 S.Ct. at 1951 (holding that the plaintiff's allegation that the defendants acted "solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest" was "conclusory and not entitled to be assumed true" (alteration in original)). "Although for the purposes of a motion to dismiss [the court] must take all of the factual allegations in the complaint as true, [it][is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 129 S.Ct. at 1949–50 (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). As the Supreme Court has cautioned, Federal Rule of Civil Procedure 8(a) requires a "showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 555 n. 3, 127 S.Ct. 1955.

Plaintiffs' § 1981 claims ultimately rest upon an unspoken assumption: that the accusations of racial discrimination leveled against them by the black GPD officers (and later by Johnson) by their very nature made Plaintiffs' race an issue. In other words, actions taken against an individual because of that individual's perceived racism are tantamount to actions taken because of that individual's own race.

This assumption was discussed and rejected in *Dartmouth Review v. Dartmouth College*, 889 F.2d 13 (1st Cir.1989), *overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández,*

367 F.3d 61 (1st Cir.2004). In *Dartmouth,* several white students working for a student newspaper published articles critical of certain university professors, including one black professor. 889 F.2d at 15. The students alleged that when they approached the black professor to obtain his response, he reacted violently and then took steps that led to charges against the students for harassment and disorderly conduct. *Id.* "As word spread, the College community erupted [against the students] in denunciation of what was widely thought to be a color-coded incident. In a highly charged atmosphere of racial tension, the College's president spoke out against the [student newspaper] and its members, falsely implying that bigotry had played a part." *Id.* at 21. The students were suspended after a hearing that they alleged to be unfair. *Id.* at 15. They sued the College and several of its officials for racial discrimination under 42 U.S.C. § 1981. *Id.* at 14–15.

The First Circuit held that their allegations failed to state a claim, because "[f]ar from leading to a reasoned inference that the College was guilty of discrimination based on the [s]tudents' color, the administration's reaction proves no more than that the College hierarchy perceived the [s]tudents' acts as racist and hence, deserving of harsher punishment than other infractions." *Id.* at 18. The First Circuit concluded that "[n]either general denunciations of racism nor refusals to meet with [the student newspaper] members ... are enough to premise an inference of discrimination based on the [s]tudents' race." *Id.* The court went on to explain:

> [The students'] theory necessarily depends upon an unmitigated assumption: that, for the College to have branded [their] behavior toward a black professor

and tacks "because of [Plaintiffs'] race" onto the end of the paragraph. (Doc. 37 ¶ 43.)

as "racist," it was necessary that they were white. The assumption is not only unproven, but unfounded, neither logically nor legally compelled.... Racial difference is by no means a condition precedent to labelling an incident "racist;" [16] nor are belligerent responses to perceived racial attacks, without more, presumed to be based on the *perpetrators'* race. Condemning acts as racist implies nothing about the actor's race, but signifies only that the *victim's* race was the cause of invidious harm.... Simply put, racial polarity is not a prerequisite to the practice of racism.

*Id.* (emphasis in original); [17] *cf. Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir.1990) (affirming summary judgment against a white plaintiff's discrimination claim under § 1983 where his counsel conceded that he was not fired because of his race but argued that "[the black defendant] terminated him because [the defendant] thought he was a racist" and concluding that "[t]his is not a claim of race discrimination within the meaning of the equal protection clause" (citing *Dartmouth* )); *Darden v. Alameda Cnty. Network of Mental Health Clients*, No. C–95–0783, 1995 WL 616633, at *2 (N.D.Cal. Oct. 4, 1995) ("Racial identity alone tells nothing about the motive of an act, which under ... the civil rights statutes ... must be racially *discriminatory.*" (emphasis in original)).

Plaintiffs argue that "[t]here is a difference between *involving race* and *because of race*," that *Dartmouth* merely *involved* race, and that Johnson's alleged actions were *because of* race and thus distinguishable from the defendants' actions in *Dartmouth.* (Doc. 55 at 8 (emphasis in original).) Plaintiffs point to no specific factual allegations in the Amended Complaint supporting this contention, however. [18] Rather, Plaintiffs' factual allegations appear to fall squarely within the "involving race" category, for the reasons already discussed.

16. Indeed, the present situation may be a case in point: the only individual Defendant against whom Plaintiffs bring a § 1981 claim for anti-white racial discrimination is Johnson, who is himself white according to the City's reply brief. (*See* Doc. 65 at 7.) (Admittedly, the Amended Complaint does not allege Johnson's race, but Plaintiffs' response brief acknowledges that "some of [Defendants] are the same race as the Plaintiffs." (Doc. 54 at 6.))

17. In the wake of the Supreme Court's *Swierkiewicz* decision (but before *Twombly* and *Iqbal* ), the First Circuit overruled several of its earlier opinions, including *Dartmouth*, to the extent they indicated that a heightened pleading standard applied to civil rights cases. *See Educadores*, 367 F.3d at 62–64, 66–67. While it is clear that courts may not impose a higher pleading standard in civil rights cases than in other types of cases, *see Twombly*, 550 U.S. at 569–70, 127 S.Ct. 1955, the standard actually applied in the relevant portion of *Dartmouth* appears compatible with the pleading standard later articulated in *Twombly* and *Iqbal*

for all civil actions. *See Dartmouth*, 889 F.2d at 17 (holding that "the key question is whether plaintiffs assembled specific facts adequate to show or raise a plausible inference that they were subjected to race-based discrimination"). In any event, *Dartmouth's* reasoning concerning the types of inferences that are plausible remains valid in this case.

18. Plaintiffs' response brief proffers a new allegation that "African–American officers who were also part of SIS were not subjected to Defendant's discriminatory treatment" and directs the court to *"See generally* (Amend. Compl.)." (Doc. 55 at 8.) No such allegation appears in the 52–page Amended Complaint, however. It is noteworthy that Plaintiffs made this claim in their response briefs to Defendants' previous motions to dismiss the original Complaint. (Doc. 22 at 7; Doc. 23 at 8.) There, too, it was unsupported. One brief cited the Proposed Amended Complaint generally; the other brief contained an incomplete citation (noting only "Cite," as if it were a reminder to complete the citation). (Doc. 22 at 7; Doc. 23 at 8.)

Furthermore, employers may be held liable if, once alerted to discrimination in the workplace, they fail to investigate or address it. *See, e.g., EEOC v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir.2011) (holding that an employer is liable for a racially hostile work environment created by a coworker against an employee if the employer "knew or should have known about the harassment and failed to take effective action to stop it" (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir.2003) (en banc))); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 186 (4th Cir.2001) (holding that an employer may only escape liability for a racially hostile work environment created by a supervisor against a subordinate if it demonstrates that it exercised reasonable care to prevent and promptly correct the harassment and the subordinate unreasonably failed to take advantage of available preventive or corrective opportunities). While there may be situations where an employer acts improperly in investigating claims of racism, it would be incongruous to hold that where an employer aggressively investigates and addresses allegations of workplace discrimination that ultimately prove unfounded, the employees investigated may state their own claim for racial discrimination without any additional specific facts and armed only with speculation that the employer initiated and conducted the investigations in bad faith and with ulterior motives.[19] *Cf. Dartmouth*, 889 F.2d at 21 (noting that "institutions must be reasonably free to investigate alle-gations of bias to ensure that racial discrimination is not being practiced on their turf" and that "[i]f every such investigation could be sidetracked by the accuseds' cries of racism, the cause of racial equality would unfairly be burdened.").

Therefore, the court finds that Plaintiffs have not plausibly alleged racial discrimination in violation of § 1981 by the City or Johnson, and their § 1981 claims will be dismissed.[20]

## C. Violation of the Fourth Amendment (Counts Four & Five)

Plaintiffs allege that the City, Johnson, Bellamy, Hastings, and Kelly took certain actions, described below, that led to "unfounded" criminal charges against Plaintiffs (which ultimately terminated in their favor) and the arrest and detention of Plaintiffs in violation of their Fourth Amendment right to be free from unreasonable searches and seizures. Defendants argue that Plaintiffs' vague allegations do not sufficiently indicate that each Defendant performed actions proximately causing Plaintiffs' indictment and arrest.

### 1. Applicable Law

■ Plaintiffs' claims are in the nature of malicious prosecution claims. Indeed, Counts Eight and Nine assert state-law malicious prosecution claims against the same five Defendants using much of the same language. (*See* Doc. 37 ¶¶ 108–20.) Although the Fourth Circuit has held that "there is no such thing as a '§ 1983 mali-

---

19. By way of contrast, in a related case this court permitted Wray's claims of discriminatory discharge based on his Caucasian race in violation of § 1981 to proceed against the City and Johnson at the Rule 12(b)(6) stage because he alleged additional supporting facts: for example, that he was constructively discharged by the City and Johnson and replaced with a Chief who was black (i.e., Bellamy). *See* Transcript of Motion to Dismiss Hearing (May 6, 2011) at 41–45, *Wray v. City*

of Greensboro, No. 1:09–CV–095 (M.D.N.C.) (Doc. 26) (containing the court's oral ruling based on (and limited to) the "unique facts of this case").

20. It is unnecessary to address Johnson's additional argument that the official-capacity claim against him should be dismissed as duplicative.

cious prosecution' claim," it has recognized "a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution—specifically, the requirement that the prior proceeding terminate favorably to the plaintiff." [21] *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir.2000). Such a claim has two principal elements: "a wrongful seizure and a termination in [the plaintiff's] favor of the proceedings following [his] seizure." *Snider v. Seung Lee*, 584 F.3d 193, 199 (4th Cir.2009), *cert. denied*, —— U.S. ——, 130 S.Ct. 2073, 176 L.Ed.2d 415 (2010); *see Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir.2005) ("In order for a plaintiff to state a section 1983 malicious prosecution claim for a seizure violative of the Fourth Amendment, we have required that the defendant have seized [plaintiff] pursuant to legal process that was not supported by probable cause and that the criminal proceedings [have] terminated in [plaintiff's] favor.' " (alterations in original) (emphasis omitted) (quoting *Brooks v. City of Winston–Salem, N.C.*, 85 F.3d 178, 183–84 (4th Cir.1996))).

Plaintiffs have clearly satisfied the second prong with their allegations that a jury acquitted Sanders of one charge and the remaining charges against him and Fox were dismissed. (*See* Doc. 37 ¶ 52.) Defendants argue, however, that Plaintiffs have not plausibly alleged a causal link between any specific actions allegedly taken by Defendants and the indictment and arrest of Plaintiffs. Thus, Defendants contend, Plaintiffs have failed to allege an unconstitutional seizure for which they are liable.

■ "[I]t is well settled that a plaintiff asserting a constitutional tort under § 1983 ... must, like any tort plaintiff, satisfy the element of proximate causation." *Adams v. Parsons*, No. 2:10–CV–0423, 2011 WL 1464856, at *5 (S.D.W.Va. Apr. 15, 2011) (discussing a Rule 12(b)(6) motion to dismiss a Fourth Amendment malicious prosecution claim); *see Blue v. Bigos*, 89 F.3d 827 (4th Cir.1996) (per curiam) (unpublished table decision) ("[P]roximate cause is part of a § 1983 plaintiff's burden." (citing *Shaw v. Stroud*, 13 F.3d 791, 798–99 (4th Cir.1994))).[22]

■ Courts have recognized that "where an officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, a grand jury, or a magistrate, the intermediary's independent decision to seek a warrant, issue a warrant, or return an indictment breaks the causal chain and insulates the officer from a section 1983 claim based on lack of probable cause for an arrest or prosecution." *Rhodes v. Smithers*, 939 F.Supp. 1256, 1274 (S.D.W.Va.1995) (citing cases from the Second, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits), *aff'd*, 91 F.3d 132 (4th Cir.1996) (per curiam) (unpublished table decision); *see Adams*, 2011 WL 1464856, at *6–*7 (applying this principle to a Rule 12(b)(6) motion to dismiss Fourth Amendment malicious prosecution claim); *see also Snider*, 584 F.3d at 206 (Stamp, J., concurring in the judgment) (citing *Rhodes* ); *Walker v. Scott*, No. 7:05–CV–00010, 2006 WL 1288315, at *5 (W.D.Va. May 4, 2006) (citing *Rhodes* ), *aff'd*, 203 Fed.Appx. 447 (4th Cir.2006) (per curiam) (unpublished opinion).

---

**21.** Although one of the City's early briefs viewed Plaintiffs as asserting a "section 1983 claim based on a false arrest" (Doc. 18 at 12), such a claim cannot be brought where the plaintiff's arrest was pursuant to a facially valid arrest warrant. *See Porterfield v. Lott*,

156 F.3d 563, 568 (4th Cir.1998). Rather, a Fourth Amendment "malicious prosecution" claim is appropriate. *See id.*

**22.** Unpublished decisions are not precedential but are cited for their persuasive authority.

█ An officer can be held liable only if he misled or unduly pressured the intermediary. *Adams*, 2011 WL 1464856, at *6 (citing cases from the Second, Third, Fifth, Seventh, Ninth, and Tenth Circuits); *accord, e.g., Snider*, 584 F.3d at 206 (Stamp, J., concurring in the judgment) (requiring that the officer have "concealed or misrepresented facts or brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne" (citing *Taylor v. Meacham*, 82 F.3d 1556, 1564 (10th Cir.1996), and *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir.1996))); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir.2004); *cf., e.g., Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) ("[T]he chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment.... At least that is so in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment." (citations omitted)); *Jackson v. Brickey*, 771 F.Supp.2d 593, 605–06 (W.D.Va.2011) (permitting a Fourth Amendment "malicious prosecution" claim to proceed against the arresting officer, because the court could "easily find that [the officer] initiated [the plaintiff's] prosecution [ for obstruction of justice] by way of his participation as the arresting officer," but dismissing the claim under Rule 12(b)(6) as to the chief of police for lack of proximate cause, because allegations that he pressured the prosecution not to offer the plaintiff any deals or to offer only a deal requiring a formal apology "fail to bridge the required gap between the non-prosecuting government agent's motive and the prosecutor's action" and "do not show that, but for [the chief's] influence, the Commonwealth would have pursued a different course of action in its prosecution of the case." (internal quotation marks omitted)).

Here, Plaintiffs' arrest, detention, and prosecution all resulted from their indictment, *see supra* note 5, which immunized Defendants against any liability for Plaintiffs' subsequent arrest, detention, and prosecution, even if probable cause was lacking, unless Defendants tainted the grand jury process by withholding exculpatory evidence or submitting false evidence. Thus, in light of the above authority, Plaintiffs must plead facts plausibly alleging either (1) that Defendants withheld exculpatory evidence from the SBI (and thus the grand jury), leading the grand jury to mistakenly find probable cause where none existed, or (2) that Defendants submitted false or misleading evidence, leading the grand jury to mistakenly find probable cause where none existed. Furthermore, Plaintiffs must allege this as to each of the five relevant Defendants. *Cf., e.g., Crouch v. City of Hyattsville, Md.*, No. 09–CV–2544, 2010 WL 4868100, at *6 (D.Md. Nov. 23, 2010) ("A plaintiff does not satisfy [Federal Rule of Civil Procedure 8] when the complaint lump[s] all the defendants together and fail[s] to distinguish their conduct because such allegations fail to give adequate notice to the defendants as to what they did wrong." (second and third alterations in original) (quoting *Classen Immunotherapies, Inc. v. Biogen IDEC*, 381 F.Supp.2d 452, 455 (D.Md.2005)) (internal quotation marks omitted)).

### 2. Plaintiffs' Allegations

#### a. Individual Defendants

█ Plaintiffs allege that all Defendants helped spread rumors of the "black book" and other accusations of racially motivated conduct by Plaintiffs (*see* Doc. 37 ¶¶ 23, 25); Johnson directed the City Attorney to meet with the complaining black officers, supposedly to collect information

to use against Plaintiffs (*id.* ¶ 26); Johnson directed the City Attorney to conduct an investigation of the GPD (*id.* ¶ 27); Johnson hired RMA, an independent firm, to investigate (*id.* ¶ 28); Johnson, Bellamy, and Hastings "manipulated and controlled" both investigations in some unspecified way (*id.* ¶ 29); Johnson reached an agreement with Hinson that included a promise to force Wray and Plaintiffs from the GPD (*id.* ¶ 31); Bellamy requested an SBI investigation of Plaintiffs' actions, with the backing of Johnson and Hastings (*see id.* ¶¶ 37–39); Bellamy suspended Plaintiffs without pay pending the adjudication of the criminal charges against them (*id.* ¶ 49); and Bellamy made allegedly defamatory statements about Plaintiffs *after* the criminal proceedings against them had terminated (*see id.* ¶ 144). None of these actions plausibly affected the evidence put before the grand jury (which was based on the SBI investigation, not the investigations by the City Attorney or RMA (*see id.* ¶ 46)) or caused the grand jury to find probable cause where none existed. Thus, Defendants cannot be held liable on the basis of these actions for a Fourth Amendment violation based on Plaintiffs' indictment, arrest, detention, or prosecution, even if probable cause was lacking.

Plaintiffs' numerous assertions that Defendants took these actions with improper motives (*see, e.g., id.* ¶¶ 25, 26, 27, 29, 31, 38, 42) do not alter this result. Nor do the roles of Johnson, Bellamy, and Hastings in the initiation of the SBI investigation render them liable for the conclusions reached by the SBI and ultimately the grand jury.[23] *Cf. Adams*, 2011 WL 1464856, at *6 ("[A]n independent act of an intermediary breaks the causal chain required for a constitutional tort claim against a police officer, unless the plaintiff shows—or alleges, at the motion to dismiss stage—that the officer mislead [sic] or unduly pressured the intermediary.").

█ What remains are mostly vague, conclusory assertions that the Defendants conspired to withhold exculpatory evidence from and provide false or misleading evidence to the SBI: "Kelly conspired and agreed with Defendants Hastings and Bellamy to deprive the Plaintiffs of their constitutionally protected rights" (Doc. 37 ¶ 40); Johnson, Bellamy, Hastings, and others "entered into an illegal agreement" to "prevent information that would be favorable to the Plaintiffs from being given to the investigating SBI officers" and "provided the SBI with false, incomplete, and/or misleading statements and information" (*id.* ¶ 43); Slone and Cuthbertson met with "Hastings and/or Bellamy and/or any other Defendant" to decide what information to provide to the SBI (*id.* ¶ 44); Johnson, Bellamy, Hastings, and provision of "false, incomplete, and misleading information" to the SBI (*id.* ¶ 46); and Johnson, Bellamy, Hastings, and others "did together illegally agree, plan, and discuss to control the flow of information to the

**23.** Indeed, it is unclear from the Amended Complaint why the mere initiation of the SBI investigation should be considered wrongful in any objective sense. Plaintiffs claim that Johnson "knew or had reason to know that an investigation by the SBI was unfounded" (Doc. 37 ¶ 38), but no factual basis is alleged to support this. (The Amended Complaint, in one of its few specific passages, alleges that Johnson acknowledged under oath that the "black book" was a proper investigative tool used only for legitimate purposes (*see id.*

¶ 24), but the "black book" was only one of the accusations that had been leveled against Plaintiffs (*see id.* ¶¶ 18, 21).) Plaintiffs' assertion appears to rest on the FBI's report that it had found no evidence against Plaintiffs. (*See, e.g., id.* ¶ 99 (alleging that Defendants "[i]nitiat[ed] an SBI investigation despite being in possession of the results of the FBI's investigation of SIS").) The Amended Complaint makes clear, however, that the FBI only investigated Plaintiffs for violations of *federal civil rights* law. (*See id.* ¶ 36.)

SBI" (*id.* ¶ 50).[24] Factual allegations supporting these conclusions are, to put it charitably, sparse at best.

Moreover, these generalized statements (and countless similar speculative, boilerplate assertions (*see, e.g., id.* ¶¶ 77–80, 82, 85–87, 90, 94–99, 102–05)) provide no indication of what actions each Defendant allegedly took. *Cf., e.g., Boykin Anchor Co. v. AT & T Corp.,* No. 5:10–CV–591, 2011 WL 1456388, at *3–*5 (E.D.N.C. Apr. 14, 2011) (dismissing unfair/deceptive trade practices claims where the amended complaint contained "only generalized and conclusory allegations against all defendants'" and "cryptically assert[ed] that the defendants were acting in concert,'" but did not "identify specific acts or conduct taken by [the moving] defendant" (citing *Robbins v. Oklahoma,* 519 F.3d 1242, 1250 (10th Cir. 2008))). *See generally Robbins,* 519 F.3d at 1250 ("[I]t is particularly important in [§ 1983 cases against multiple government actors in their individual capacities] that the complaint make clear exactly *who* is alleged to have done *what* to *whom,* to provide each individual with fair notice as to the basis of the claims against him or her ...." (emphasis in original)); *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC,* 499 F.3d 663, 667 (7th Cir. 2007) ("[A]t some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8.").

As to Johnson, Plaintiffs nowhere allege that he ever communicated with the SBI. They do not allege any piece of information he provided to or withheld from the SBI, nor do they provide any hint of how such information might have affected the grand jury's probable cause determination. The Amended Complaint is thus devoid of any allegations potentially rendering Johnson liable for a violation of Plaintiffs' Fourth Amendment rights, other than vague allegations of a conspiracy to harm Plaintiffs, which are insufficient "to raise a right to relief above the speculative level" or to "nudge[ ] the[ ] claim[ ] across the line from conceivable to plausible." *Twombly,* 550 U.S. at 555, 570, 127 S.Ct. 1955; *cf., e.g., id.* at 556–57, 127 S.Ct. 1955 (finding an antitrust complaint containing "an allegation of parallel conduct and a bare assertion of conspiracy" insufficient to state a claim and holding that "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *A Society Without A Name v. Virginia,* 655 F.3d 342, 346–47 (4th Cir.2011) (affirming the Rule 12(b)(6) dismissal of a 42 U.S.C. § 1985 conspiracy claim "because it is comprised almost entirely of conclusory allegations unsupported by concrete facts," such as "Doe(s) and the City entered into a conspiracy," they had a "meeting of the minds that they would act in concert with VCU," and "Homeward was created as part of the conspiracy and ... became part of the conspiracy"); *Simmons v. Poe,* 47 F.3d 1370, 1377 (4th Cir.1995) (stating on summary judgment that "we have specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts"); *McFadyen v. Duke Univ.,* 786 F.Supp.2d 887, 970–72 (M.D.N.C.2011) (applying *Simmons* in the Rule 12(b)(6) context); *McHam v. N.C.*

---

**24.** Many of these vague assertions were not in the original Complaint but were added to the Amended Complaint following Defendants' first motions to dismiss on the ground that the Complaint failed to state a claim. (*See, e.g.,* Doc. 37 ¶ 43 (adding an allegation of an "illegal agreement"); *id.* ¶ 44 (new paragraph); *id.* ¶ 46 (largely new material); *id.* ¶ 50 (new paragraph).)

*Mut. Life Ins. Co.*, No. 1:05–CV–1168, 2007 WL 1695914, at *4–*5 (M.D.N.C. June 11, 2007) (same), *aff'd*, 250 Fed. Appx. 545 (4th Cir.2007) (per curiam) (unpublished opinion). The Fourth Amendment claims against Johnson ultimately consist of nothing but suspicion that the proceedings against Plaintiffs were somehow manipulated and that Johnson was somehow involved.

Bellamy and Hastings were allegedly interviewed by the SBI (*see* Doc. 37 ¶ 39), but Plaintiffs provide no further details, and there is no allegation that Kelly was interviewed. Plaintiffs allege that Slone and Cuthbertson made unspecified false statements to the SBI that were inconsistent with unspecified earlier statements, but Plaintiffs have not brought a Fourth Amendment claim against Slone and Cuthbertson, and they do not allege any connection between these statements and the other Defendants, except to assert that the statements were somehow part of a scheme by all Defendants. (*See id.* ¶¶ 46, 50.) An additional allegation that "Kelly failed to notify the SBI of false criminal and administrative allegations brought forth by Gary Hastings which concerned Plaintiff Sanders" (*id.* ¶ 40), is vague and leaves unclear whether Hastings' "false" statements were made to the SBI or another entity or person, why those statements were significant or relevant, and how Kelly had any duty to correct statements made by other officers.

Only two pertinent allegations in the Amended Complaint approach specificity: first, that Kelly "withdrew" and "destroyed" a document referred to as "Memorandum # 9," that she did this at Hastings' request, and that the document "pertained to the criminal investigation of the Plaintiffs" (*id.* ¶ 40); and second, that Hastings interviewed a "witness" concerning the "black book" but "suppress[ed]" the interview notes and "refus[ed] to produce" them to Plaintiffs or the SBI, with the alleged consent of Bellamy (*id.* ¶ 50). The Amended Complaint does not explain the significance of these alleged actions, however, much less how they affected the grand jury proceeding or could have caused the grand jury to find probable cause where none allegedly existed. It remains unknown what "Memorandum # 9" allegedly contained, what the "black book" interview allegedly was about, or why either was relevant to the grand jury's probable cause determination.

■■■■ Furthermore, Plaintiffs have not alleged facts supporting their underlying assertions that probable cause was lacking (*id.* ¶¶ 46, 47, 80)—a legal conclusion. Unless Plaintiffs' indictment and arrest were unsupported by probable cause, there was no Fourth Amendment violation at all, regardless of any scheming by Defendants. *See, e.g., Burrell,* 395 F.3d at 514 (requiring a seizure "pursuant to legal process that was not supported by probable cause" (quoting *Brooks,* 85 F.3d at 183)). (*Cf.* Doc. 37 ¶¶ 77, 85 (resting Plaintiffs' Fourth Amendment claims on the "institution of unfounded criminal charges" against them and their subsequent "unlawful[ ]" arrest and detainment).) Yet Plaintiffs nowhere indicate in what way probable cause was lacking. *Cf. Antonio v. Moore,* 174 Fed.Appx. 131, 137 (4th Cir. 2006) (per curiam) (unpublished opinion) (affirming the Rule 12(b)(6) dismissal of a § 1983 Fourth Amendment claim based on an allegedly invalid arrest warrant, in part because the plaintiff's "mere allegation that the arrest warrant was issued without probable cause' is too conclusory to pass muster under Rule 12(b)(6)"); *Erikson v. Pawnee Cnty. Bd. of Cnty. Comm'rs,* 263 F.3d 1151, 1154–55 (10th Cir.2001) (affirming the Rule 12(b)(6) dismissal of a § 1983 Fourth Amendment "malicious prosecu-

tion" claim where "beyond the conclusory allegation in his complaint that no probable cause existed, plaintiff has not alleged any specific facts showing there was a lack of probable cause for his arrest and prosecution"). The acquittal of Sanders as to one charge and the dismissal of the remaining charges against both Plaintiffs (*see* Doc. 37 ¶ 52) do not plausibly imply that their original indictment and arrest were unsupported by probable cause. Rather, because "[probable cause] is a lesser standard than the one necessary to convict, *i.e.*, beyond a reasonable doubt," *United States v. Galloway*, 274 Fed.Appx. 241, 245 (4th Cir.2008) (per curiam) (unpublished opinion) (citing *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)), they only show that the available evidence was insufficient to convict Plaintiffs. *Accord Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir.1998); *cf. Erikson*, 263 F.3d at 1153–55 (finding the plaintiff's allegation of lack of probable cause for his arrest and prosecution to be conclusory and unsupported, even though the plaintiff was acquitted of certain charges by a jury and the other charges were dismissed after two mistrials).

 Plaintiffs contend that discovery is necessary "to afford [them] an opportunity to discover' what information Defendants provided to the SBI" (Doc. 21 at 6) and that providing additional details "would be unduly burdensome to the Plaintiffs since all those who would have knowledge about [the alleged] conversations are named Defendants" (Doc. 54 at 6 (emphasis omitted)). But Plaintiffs may not simply assert that all Defendants somehow committed Fourth Amendment violations and then demand discovery to determine whether and how Defendants might have committed

such violations. "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.Ct. at 1950. As this court has noted previously, "[i]f Rule 12(b)(6) is to serve any useful purpose, it must require a plaintiff to set forth sufficient facts to state a claim at the initial pleading stage before expensive discovery ensues." *EEOC v. Tuscarora Yarns, Inc.*, No. 1:09–CV–217, 2010 WL 785376, at *3 (M.D.N.C. Mar. 3, 2010). Moreover, Plaintiffs' allegation that "as a result of a *Brady* Motion filed by counsel for Scott Sanders, the SBI received statements, which had been suppressed by the Defendants[,] that led to all charges against Scott Sanders and Tom Fox being dismissed by the SBI" (Doc. 37 ¶ 52) indicates that much of the material purportedly suppressed by Defendants has already been disclosed, at least to Sanders. Yet Plaintiffs have not provided any hint of what this "suppressed" information was, who "suppressed" it, or how it related, if at all, to the existence of probable cause.

Based on all the above, the court concludes that Plaintiffs have not plausibly alleged a Fourth Amendment violation by Johnson, Bellamy, Hastings or Kelly in their official or individual capacities, and these claims will be dismissed.[25]

### b. The City

Plaintiffs' claim against the City is based on the actions of Johnson, Bellamy, Hastings, and Kelly. (*See* Doc. 23 at 9, 11; Doc. 37 ¶¶ 77–80, 82.) As noted previously, a claim against a municipality under § 1983 requires an allegation of an "official policy or custom." *See Jordan*, 15 F.3d at 338. The City contends that Plaintiffs have not plausibly alleged that the rele-

---

**25.** It is therefore unnecessary to address the individual Defendants' additional arguments that the individual-capacity claims against them are barred by qualified immunity and the official-capacity claims should be dismissed as duplicative.

vant individual Defendants had final policymaking authority, so the "official policy or custom" requirement has not been satisfied and the City cannot be liable under § 1983 for these Defendants' actions. *Cf. Fire Fighters Ass'n,* 64 F.3d at 964–66 (rejecting a § 1983 claim against the City because it was based on actions by a City employee who lacked "final policymaking authority"). The court need not decide this issue, however, because Plaintiffs have not plausibly alleged a Fourth Amendment violation by the individual Defendants, so any claim against the City based on their actions must fail. Therefore, the Fourth Amendment claims against the City will be dismissed.

### D. Violation of 42 U.S.C. § 1985 (Counts Six & Seven)

Plaintiffs' final federal claims allege a conspiracy in violation of 42 U.S.C. § 1985. Plaintiffs' briefs clarify that these claims are brought under subsection (3) of § 1985, which reads in pertinent part:

> If two or more persons in any State … conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws …; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Plaintiffs contend that they have alleged just such a conspiracy to harm them by all six individual Defendants and RMA. Defendants argue in response that Plaintiffs do not allege facts plausibly supporting a § 1985 conspiracy claim. The individual Defendants previously argued in the alternative, in connection with the original Complaint, that the intracorporate conspiracy doctrine barred Plaintiffs' official-capacity § 1985 claims against them. These Defendants' current briefing "incorporate[s] their prior briefs" (Doc. 42 at 1), and RMA now argues that the intracorporate conspiracy doctrine applies, at least to the extent RMA is sued in its "official capacity."

#### 1. RMA

A conspiracy to deny equal protection of the laws in violation of § 1985(3) requires "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons,* 47 F.3d at 1376.

The Amended Complaint's only specific allegations concerning RMA are that Johnson and the Greensboro City Council contracted with RMA to "provide a purportedly objective overview" of the City Attorney's investigative process (Doc. 37 ¶ 28) and that RMA's use of a polygraph did not comport with the bylaws of the American Association of Police Polygraphists or N.C. Gen.Stat. § 74C–8(d)(2), "which provides for the person administering the polygraph, in this case Steve Davenport, to be of good moral character" (*id.* ¶ 163; *see id.* ¶¶ 30, 140). Plaintiffs also make several less specific assertions about

RMA: that its investigation "contained numerous factual errors and unjustified conclusions" (*id.* ¶ 29), that Johnson, Bellamy, and Hastings somehow "manipulated and controlled" the investigation (*id.*), and that RMA "committed a series of negligent actions" and "failed to investigate properly and otherwise failed to act reasonably" (*id.* ¶¶ 30, 140, 163). Even accepting these conclusory statements as true, nothing in the Amended Complaint conveys the slightest hint that RMA participated in a conspiracy against Plaintiffs "motivated by . . . invidiously discriminatory animus." Plaintiffs' multiple boilerplate recitations of the elements of § 1985(3)—for example, that "RMA entered into an unlawful agreement with [other Defendants] and with specific racial animus to deprive Plaintiffs . . . of the equal enjoyment of rights secure to all" (*id.* ¶ 97)—do not change this result. *Cf. Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 ("[A] formulaic recitation of the elements of a cause of action will not do."). Therefore, Plaintiffs' § 1985 claims against RMA will be dismissed for failure to state a claim.[26]

## 2. Individual Defendants

 The intracorporate conspiracy doctrine bars claims based on an alleged conspiracy among a corporation and its officers, employees, and agents. *See Buschi v. Kirven*, 775 F.2d 1240, 1251–53 (4th Cir.1985) (applying the doctrine to a § 1985(3) claim); *Turner v. Randolph Cnty., N.C.*, 912 F.Supp. 182, 186–87 (M.D.N.C.1995) (same). The doctrine is applicable to municipalities. *See Iglesias v. Wolford*, 539 F.Supp.2d 831, 835–36 (E.D.N.C.2008). Moreover, merely suing the officers, employees, or agents in their individual capacities does not change the result. *Buschi*, 775 F.2d at 1252.

 The remaining Defendants were City employees at all relevant times (*see* Doc. 37 ¶¶ 5–10), and they allegedly took all actions relevant to the § 1985 claims "by virtue of their authority as agents for the City of Greensboro" and "were acting in the performance of official duties" (*id.* ¶¶ 95, 103). Consequently, under the intracorporate conspiracy doctrine, these Defendants could not have conspired among themselves.

Moreover, even in the absence of this doctrinal bar, the Amended Complaint still fails to allege sufficient facts to support a § 1985 conspiracy claim. The "conspiracy of two or more persons" element is supported only by Plaintiffs' vague assertions discussed previously. (*See, e.g., id.* ¶ 40 ("Kelly conspired and agreed with Defendants Hastings and Bellamy to deprive the Plaintiffs of their constitutionally protected rights . . . ."); *id.* ¶ 50 ("Johnson, Hastings, Bellamy, [Slone], and Cuthbertson did together illegally agree, plan, and discuss to control the flow of information to the SBI . . . .").) Such conclusory statements do not satisfy *Twombly* and *Iqbal. See, e.g., Twombly*, 550 U.S. at 556–57, 127 S.Ct. 1955; *A Society Without A Name*, 655 F.3d at 346–47. The requirement of an "overt act committed . . . in connection with the conspiracy" and "result[ing] in injury to the plaintiff" is not satisfied because the Amended Complaint rarely indicates what specific actions were taken by any particular Defendant. For example, Count Six provides the following laundry list of generalities and speculation:

> Defendants participated in a variety of acts in furtherance of this conspiracy including, *inter alia:*
>
> a. Initiating an SBI investigation despite being in possession of the re-

---

**26.** It is therefore unnecessary to address RMA's additional arguments based on the in-

tracorporate conspiracy doctrine and the applicable statute of limitations.

sults of the FBI's investigation of SIS.

b. Providing false information to the SBI.

c. Providing incomplete information to the SBI.

d. Providing misleading information to the SBI.

e. Preventing the SBI from receiving full and complete information.

f. Make [sic] false accusations regarding a "black book" in the media and during SBI investigations.

g. Improperly suspending Scott Sanders and Tom Fox without pay for more than one year.

h. Destroying and hiding exculpatory evidence.

i. Withholding exculpating [sic] evidence from the SBI in an effort to incite criminal charges against Scott Sanders and Tom Fox.

(Doc. 37 ¶ 99.)[27] As discussed previously, these assertions—aside from item (a) and, minus the "[i]mproperly," item (g)—find meager factual support in the Amended Complaint. To the extent Plaintiffs allege specific actions—for example, that Kelly destroyed "Memorandum # 9" (*id.* ¶ 40)—no factual allegations indicate that these actions were part of a conspiracy to "deprive [Plaintiffs] of the equal enjoyment of rights secured by the law to all." Finally, the element of a § 1985 claim requiring a "specific class-based, invidiously discriminatory animus" is unsupported by any facts in the Amended Complaint, for the reasons provided in the analysis of Plain-

tiffs' § 1981 claims. Plaintiffs' boilerplate recitation of this element, such as their statement that a personal vendetta "coupled with racial animus led Defendant Hastings to take the actions complained upon" (*id.* ¶ 42), is insufficient. *Cf. Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 ("[A] formulaic recitation of the elements of a cause of action will not do.").

Therefore, Plaintiffs' § 1985 claims against the individual Defendants in their official and individual capacities will be dismissed.[28]

### E. Plaintiffs' State–Law Claims

Plaintiffs' remaining claims (Counts One, Eight through Sixteen) are all based on North Carolina law. Under 28 U.S.C. § 1367(c), a federal district court "may decline to exercise supplemental jurisdiction" over such state-law claims if "the district court has dismissed all claims over which it has original jurisdiction." Because this court will dismiss all Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over their state-law claims, which will be dismissed without prejudice. *Cf., e.g., Orange Cnty. Rescue Squad, Inc. v. Cnty. of Orange,* No. 1:09–CV–244, 2011 WL 976768, at *11 (M.D.N.C. Mar. 17, 2011) ("Because this court will dismiss, with prejudice, all claims over which it has original jurisdiction, this court declines to exercise supplemental jurisdiction over the state-law portions of [the remaining claims] and will dismiss those state-law claims without prejudice.").

---

**27.** The Amended Complaint is incomplete even in its reference to which prior allegations it intended to rely upon for this claim (see Doc. 37 ¶ 96 (referring to "the actions described in paragraph ____ of this complaint")), although the court has considered all of its factual allegations.

**28.** It is unnecessary to address Defendants' additional argument that the City should be substituted for the official-capacity claims.

### F. Amendment

 Ordinarily, leave to amend may be granted liberally to cure any defects in pleading. Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."); *accord Simmons v. United Mortg. & Loan Inv., LLC,* 634 F.3d 754, 769 (4th Cir.2011). But Plaintiffs do not request further amendment, and the defects that doom Plaintiffs' federal claims were identified by Defendants in their first round of motions to dismiss. Plaintiffs requested, and the court granted, leave to "add[ ] factual allegation[s] that clarify and amplify the factual basis for Plaintiffs' allegations." (Doc. 20 at 1; *see* Doc. 36.) Therefore, Plaintiffs have been provided a fair opportunity to attempt to cure the deficiencies in their claims, which they have failed to do. The court concludes, after careful consideration in light of the reasons explained for the dismissal of Plaintiffs' claims, that further leave to amend is unwarranted. *Cf. Pittston Co. v. United States,* 199 F.3d 694, 705 (4th Cir.1999) (noting that leave to amend should be freely given "[i]n the absence of any apparent or declared reason—such as ... repeated failure to cure deficiencies by amendments previously allowed" (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962))).

### III. CONCLUSION

For the reasons provided above, therefore,

IT IS ORDERED that the motions to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by Defendants John D. Slone and Ernest L. Cuthbertson (Doc. 39), Timothy R. Bellamy, Gary W. Hastings, and Martha T. Kelly (Doc. 40), Mitchell Johnson (Doc. 41), The City of Greensboro (Doc.

43), and Risk Management Associates, Inc. (Doc. 45) are GRANTED as to all federal claims (Counts Two, Three, Four, Five, Six and Seven), which are DISMISSED WITH PREJUDICE. The court declines to exercise jurisdiction over all remaining claims, which are DISMISSED WITHOUT PREJUDICE.